# 26-156

## United States Court of Appeals for the Second Circuit

IN RE GRAND JURY SUBPOENAS TO THE OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL,

*Petitioner-Appellee*,

v.

UNITED STATES OF AMERICA,

*Respondent-Appellant.*

On Appeal from the United States District Court for the Northern District of New York, Case No. 25-mc-19, Hon. Lorna G. Schofield

## BRIEF FOR PETITIONER-APPELLEE OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL

BARBARA D. UNDERWOOD
  *Solicitor General*
KUMIKI GIBSON
MICHAEL JAFFE
OFFICE OF THE NEW YORK STATE
ATTORNEY GENERAL
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8000

DONALD B. VERRILLI, JR.
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
  Suite 500E
Washington, DC 20001
Telephone: (202) 220-1100

HAILYN J. CHEN
VICTORIA A. DEGTYAREVA
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue,
  50th Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100

*Counsel for Petitioner-Appellee*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................ 1

STATEMENT OF THE ISSUES ....................................................... 5

STATEMENT OF THE CASE .......................................................... 6

    A.    OAG's Investigations into President Trump and His Allies .............................................................................. 6

    B.    President Trump's Campaign Against OAG and Attorney General James ................................................ 8

    C.    Sarcone's Appointment and Investigation into OAG ........... 10

    D.    Courts Across the Country Have Invalidated President Trump's Defective Appointments ......................... 13

    E.    The District Court Grants OAG's Motion to Quash and Disqualifies Sarcone ............................................... 15

STANDARD OF REVIEW ............................................................... 18

SUMMARY OF ARGUMENT ......................................................... 19

ARGUMENT ................................................................................... 21

I.    SARCONE'S APPOINTMENT WAS INVALID ........................... 21

    A.    The Attorney General Cannot Appoint an Acting U.S. Attorney by Naming a First Assistant After a Vacancy Arises ..................................................................... 21

        1.    The Appointment of Acting U.S. Attorneys ................. 21

        2.    The FVRA's Automatic Succession Provision Applies Only to the Incumbent First Assistant ......... 24

        3.    DOJ's Counterarguments Fail .................................... 31

    B.    The Attorney General Cannot Appoint a *De Facto* Acting U.S. Attorney via Delegation ................................... 41

        1.    The FVRA Prohibits the Use of a Special Attorney Designation to Appoint an Acting U.S. Attorney ................................................................. 42

# TABLE OF CONTENTS
## (Continued)

**Page**

2.  DOJ Cannot Sidestep the Exclusivity Provision by Relabeling Sarcone a Non-Acting Official ..............44

C.  Permitting DOJ's Maneuver Would Embrace the Primary Evil the FVRA and the Appointments Clause Were Meant to Prevent.......................................51

II.  THE DISTRICT COURT CORRECTLY QUASHED THE SUBPOENAS AND DISQUALIFIED SARCONE........................53

A.  Sarcone Acted Without Lawful Authority When He Sought the Subpoenas.........................................54

B.  Sarcone Was Never a Special Attorney or First Assistant.................................................59

1.  Sarcone Was Not a Special Attorney...........................60

2.  Sarcone Was Not a First Assistant.............................63

C.  Sarcone's Lack of Lawful Authority Invalidates the Subpoenas and Requires His Disqualification ....................65

1.  Rule 17 Authorizes a Court to Quash a Subpoena Obtained Without Lawful Authority ...........................66

2.  Sarcone's Improper Appointment Requires His Disqualification ..........................................67

CONCLUSION ......................................................68

CERTIFICATE OF COMPLIANCE.......................................70

CERTIFICATE OF SERVICE...........................................71

ii

# TABLE OF CITATIONS

**Page(s)**

FEDERAL CASES

*Arthrex, Inc. v. Smith & Nephew,*
35 F.4th 1328 (Fed. Cir. 2022)...................................................... 48, 49

*Asylumworks v. Mayorkas,*
590 F. Supp. 3d 11 (D.D.C. 2022)........................................................51

*Bissonnette v. LePage Bakeries Park St., LLC,*
601 U.S. 246 (2024)...............................................................................26

*BNSF Ry. Co. v. Loos,*
586 U.S. 310 (2019)...............................................................................38

*Bowsher v. Merck & Co., Inc.,*
460 U.S. 824 (1983)...............................................................................41

*Bowsher v. Synar,*
478 U.S. 714 (1986)...............................................................................50

*Buckley v. Valeo,*
424 U.S. 1 (1976)...................................................................................... 1

*City of Chicago v. Fulton,*
592 U.S. 154 (2021)...............................................................................37

*Collins v. Yellen,*
594 U.S. 220 (2021)...............................................................................57

*Cummings v. Missouri,*
71 U.S. (4 Wall.) 277 (1867)................................................................53

*Doe v. DiGenova,*
779 F.2d 74 (D.C. Cir. 1985)................................................................56

*Edmond v. United States,*
520 U.S. 651 (1998)..................................................................... 1, 51, 57

iii

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*First Nat'l Bank of Tulsa v. DOJ*,
  865 F.2d 217 (10th Cir. 1989)..................................................56

*Fischer v. United States*,
  603 U.S. 480 (2024)..................................................32

*Flinton v. Comm'r of Soc. Sec.*,
  143 F.4th 90 (2d Cir. 2025)..................................................68

*Gonzales & Gonzales Bonds & Ins. Agency v. DHS*,
  107 F.4th 1064 (9th Cir. 2024) ..................................................48

*In re Grand Jury Proceeding (Oberlander)*,
  971 F.3d 40 (2d Cir. 2020) ..................................................55, 56

*In re Grand Jury Subpoena Duces Tecum Dated
  Jan. 2, 1985 (Simels)*,
  767 F.2d 26 (2d Cir. 1985) ..................................................56, 67

*In re Grand Jury Subpoenas Returnable Dec. 16, 2015*,
  871 F.3d 141 (2d Cir. 2017) ..................................................18

*Gustafson v. Alloyd Co., Inc.*,
  513 U.S. 561 (1995)..................................................32

*Hooks v. Kitsap Tenant Support Servs., Inc.*,
  816 F.3d 550 (9th Cir. 2016)..................................................31, 50, 51

*Kajmowicz v. Whitaker*,
  42 F.4th 138 (3d Cir. 2022)..................................................49

*L.M.-M. v. Cuccinelli*,
  442 F. Supp. 3d 1 (D.D.C. 2020)..................................................28, passim

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024)..................................................41

iv

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Lucia v. SEC,*
585 U.S. 237 (2018)..................................................................57, 59, 68

*Newman v. Schiff,*
778 F.2d 460 (8th Cir. 1985)........................................................ 61, 64

*NLRB v. Noel Canning,*
573 U.S. 513 (2014)................................................................................1

*NLRB v. SW Gen., Inc.,*
580 U.S. 288 (2017)............................................................. 2, passim

*In re Order to Authorize Disclosure of Tax Returns,*
2026 WL 63331 (N.D.N.Y. Jan. 8, 2026) ...........................................48

*In re Persico,*
522 F.2d 41 (2d Cir. 1975) ........................................................... 62, 63

*Pulsifer v. United States,*
601 U.S. 124 (2024)...................................................................... 29, 34

*Rumsfeld v. Padilla,*
542 U.S. 426 (2004)............................................................................26

*Schaghticoke Tribal Nat. v. Kempthorne,*
587 F.3d 132 (2d Cir. 2009) ..............................................................48

*Springfield Hosp., Inc. v. Guzman,*
28 F.4th 403 (2d Cir. 2022)................................................................37

*In re Subpoena Issued to Dennis Friedman,*
350 F.3d 65 (2d Cir. 2003) ........................................................... 18, 46

*SW Gen., Inc. v. NLRB,*
796 F.3d 67 (D.C. Cir. 2015)................................................. 30, 34, 35

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Trump v. James,*
    2022 WL 1718951 (N.D.N.Y. May 27, 2022) ........................................ 6

*Trump v. United States,*
    603 U.S. 593 (2024)............................................................... 53, 68

*TRW Inc. v. Andrews,*
    534 U.S. 19 (2001)..................................................................... 29

*United States v. Aquart,*
    912 F.3d 1 (2d Cir. 2018) ............................................................ 60

*United States v. Badalamenti,*
    794 F.2d 821 (2d Cir. 1986) ......................................................... 19

*United States v. Calk,*
    87 F.4th 164 (2d Cir. 2023)........................................................... 67

*United States v. Comey,*
    810 F. Supp. 3d 768 (E.D. Va. 2025) .......................................... 14, 66

*United States v. Friedberg,*
    558 F.3d 131 (2d Cir. 2009) .......................................................... 18

*United States v. Garcia,*
    2025 WL 2784640 (D. Nev. Sep. 30, 2025)........................... 15, passim

*United States v. Giraud,*
    160 F.4th 390 (3d Cir. 2025)............................................... 10, passim

*United States v. Giraud,*
    795 F. Supp. 3d 560 (D.N.J. 2025)............................................. 66, 68

*United States v. James,*
    810 F. Supp. 3d 752 (E.D. Va. 2025) ..................................... 14, 66, 68

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*United States v. Naviwala,*
    2026 WL 658885 (D.N.J. Mar. 9, 2026) .............................. 31, passim

*United States v. Ndissi,*
    2026 WL 318836 (D. Vt. Feb. 5, 2026) ................................................. 59

*United States v. R. Enters.,*
    498 U.S. 292 (1991) ............................................................................ 67

*United States v. Ramirez,*
    807 F. Supp. 3d 1086 (C.D. Cal. 2025) ............................... 15, passim

*United States v. Ramirez-Martinez,*
    2026 WL 113431 (D.N.M. Jan. 14, 2026) ........................... 15, passim

*United States v. Trump,*
    740 F. Supp. 3d 1245 (S.D. Fla. 2024) ............................................. 66

*United States v. Walker,*
    243 F. App'x 621 (2d Cir. 2007) ....................................................... 19

*United States v. Weiner,*
    392 F. Supp. 81 (N.D. Ill. 1975) ....................................................... 62

*Widakuswara v. Lake,*
    2026 WL 638676 (D.D.C. Mar. 7, 2026) ........................................... 30

*Willie v. Lutnick,*
    158 F.4th 539 (4th Cir. 2025) ..................................................... 60, 64

*Zuber v. Allen,*
    396 U.S. 168 (1969) ........................................................................... 40

**STATE CASES**

*People v. Nat'l Rifle Ass'n of Am., Inc.,*
    171 N.Y.S.3d 782 (N.Y. Sup. Ct. 2022) .............................................. 8

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*People v. Nat'l Rifle Ass'n of Am., Inc.*,
  203 N.Y.S.3d 255 (N.Y. App. Div. 2023)...............................................7

*People v. Trump*,
  237 N.Y.S.3d 443 (N.Y. App. Div. 2025)...............................................7

*People v. Trump Org., Inc.*,
  169 N.Y.S.3d 612 (N.Y. App. Div. 2022)...............................................7

*People v. Trump Org., Inc.*,
  2022 WL 489625 (N.Y. Sup. Ct. Feb. 17, 2022)...................................6

*People v. Trump Org., Inc.*,
  38 N.Y.3d 1053 (N.Y. 2022) ...............................................................7

### FEDERAL STATUTES

5 U.S.C. § 403(h)..............................................................................33, 34

5 U.S.C. § 3345(a)........................................................................ 2, passim

5 U.S.C. § 3345(b)..................................................................................24

5 U.S.C. § 3346(a)...................................................................... 12, passim

5 U.S.C. § 3347(a)..................................................................................42

5 U.S.C. § 3347(b)...................................................................... 42, passim

26 U.S.C. § 6103(i)(1)(A)(i) ...................................................................48

28 U.S.C. § 515 ........................................................................ 11, passim

28 U.S.C. § 541(a)............................................................................ 1, 21

28 U.S.C. § 546 ........................................................................ 11, passim

viii

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

Preserving United States Attorney Independence Act of 2007,
Pub. L. No. 110-34, § 2,
121 Stat. 224 (2007) .................................................................... 24

USA PATRIOT Improvement and Reauthorization Act of 2005,
Pub. L. No. 109-177, Title V, § 502,
120 Stat. 192 (2006) .................................................................... 24

**FEDERAL RULES**

Fed. R. Crim. P. 17 .......................................................................... 67

**FEDERAL REGULATIONS**

28 C.F.R. § 0.137(b) ........................................................................ 63

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. II, § 2, cl. 2 ..................................................... 1, 21

**LEGISLATIVE MATERIALS**

144 Cong. Rec. S12822 (daily ed. Oct. 21, 1998) ..................... 39

144 Cong. Rec. S12861 (daily ed. Oct. 21, 1998) ..................... 39

H.R. Rep. No. 110-58 (2007) ........................................................ 24

S. Rep. No. 105-250 (1998) ............................................. 35, passim

**OTHER AUTHORITIES**

Robert H. Jackson, U.S. Att'y Gen., Address at the Second Annual
Conference of United States Attorneys: The Federal Prosecutor
(Apr. 1, 1940), *available at* https://www.justice.gov/
sites/default/files/ag/legacy/2011/09/16/04-01-1940.pdf
(last visited Apr. 5, 2026) ...................................................... 3, 53

ix

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Designation of Acting Assoc. Att'y Gen.*,
   25 Op. O.L.C. 177 (2001) ............................................................. 34, 41

*Guidance on Application of Fed. Vacancies Reform Act of 1998*,
   23 Op. O.L.C. 60 (1999) ...................................................................... 49

Webster's New International Dictionary (1910)..................................... 61

Webster's Third New International Dictionary (1993) ..................... 44, 64

x

## INTRODUCTION

Article II of the Constitution requires the President to obtain "the Advice and Consent of the Senate" before appointing certain "Officers of the United States," including United States Attorneys. U.S. Const. art. II, § 2, cl. 2; *see* 28 U.S.C. § 541(a). The Framers imposed this constraint on the presidential appointment power for a vital reason: to prevent presidents from installing "unfit characters" who lack any "merit" beyond their personal allegiance to the President or their "pliancy" and "obsequious[ness]." The Federalist No. 76, at 457 (Alexander Hamilton) (Clinton Rossiter ed., 1961); *see also NLRB* v. *Noel Canning*, 573 U.S. 513, 523 (2014).

As the Supreme Court has emphasized, the Appointments Clause is "more than a matter of 'etiquette or protocol'; it is among the significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659 (1998) (quoting *Buckley v. Valeo*, 424 U.S. 1, 125 (1976) (per curiam)). It protects liberty by giving Congress the constitutional authority to demand that those who wield executive power owe their primary allegiance to the rule of law, not to the whims or prejudices of any particular President. *See Noel Canning*, 573 U.S. at

1

602 (Scalia, J., concurring) ("[W]hile the Constitution's government-structuring provisions can seem 'clumsy' and 'inefficient,' they reflect hard choices consciously made by men who had lived under a form of government that permitted arbitrary governmental acts to go unchecked." (quotations omitted)).

Because the Senate confirmation process sometimes moves slowly, Congress has given a limited authority to the President to install interim officials to discharge the responsibilities of offices that require confirmation. *See NLRB* v. *SW Gen., Inc.*, 580 U.S. 288, 292-93 (2017). The Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3345 *et seq.*, confers that authority. Critically, however, the FVRA also strictly limits both who may serve in such an "acting" role and how long such officials may serve. Those limits ensure that presidents cannot abuse the narrow authority conferred by the FVRA to evade the liberty-protecting requirements of the Appointments Clause.

Nowhere are the checks imposed by the Appointments Clause and the FVRA more essential than in choosing U.S. Attorneys—who, as former Attorney General Robert Jackson put it, wield an "immense power to strike at citizens, not with mere individual strength, but with all the

2

force of government itself."[1]  Allowing the Department of Justice ("DOJ") to install Acting U.S. Attorneys who will weaponize the federal criminal justice system to conduct vendettas against a president's political rivals is as obvious an affront to the Constitution's foundational principles as one could imagine.

Yet that is precisely what President Trump and DOJ are trying to do.  Indeed, DOJ has concocted an elaborate scheme to install loyalists who can wield the full power of a U.S. Attorney *indefinitely* without any need for Senate confirmation and notwithstanding the strictures of the FVRA.

This appeal involves one such appointment: that of John Sarcone III as Acting U.S. Attorney for the Northern District of New York.  Since the outset, Sarcone has made clear that he is more than willing to use the "immense power" of DOJ's prosecutorial authority to advance the President's vendetta against Letitia James, the New York Attorney General.  And he has delivered.  He opened criminal investigations into

---

[1] Address at the Second Annual Conference of United States Attorneys: The Federal Prosecutor (Apr. 1, 1940), *available at* https://www.justice. gov/sites/default/files/ag/legacy/2011/09/16/04-01-1940.pdf  (last  visited Apr. 5, 2026) (hereinafter Jackson).

Attorney General James's office, the Office of the New York State Attorney General ("OAG"), and he also obtained two sweeping grand jury subpoenas directed at OAG, demanding any records related to two enforcement actions OAG successfully pursued against Mr. Trump[2]—when he was a private citizen—and his political allies.

Unsurprisingly, DOJ's effort to hand over control of the federal prosecutorial power to a pliant political operative is flatly unlawful. This Court should see straight through DOJ's maneuver. The interpretation of the FVRA on which DOJ relied to install Sarcone is plainly wrong, as the district court and every other court to have considered the question has held, because it would render a dead letter the FVRA's strict limits on who can serve in an acting capacity. And DOJ's fallback position—that even if Sarcone's appointment as Acting U.S. Attorney was unlawful, he could nevertheless play the exact same role because DOJ delegated all of the powers of the U.S. Attorney to him in a so-called "non-acting capacity"—is a transparent attempt to circumvent both the FVRA and

---

[2] This brief refers to President Trump as "President" when discussing his time in office and refers to him as "Mr. Trump" when discussing his time as a private citizen.

4

Congress's constitutional power to confirm appointments.

In short, allowing DOJ to do what it is attempting do here—handpick the Nation's top prosecutors based on their personal loyalty to the President rather than their expertise, experience, and commitment to public justice—would countenance precisely the evil that the Appointments Clause and the FVRA were designed to forestall.

Because Sarcone lacked any lawful authority when he obtained the grand jury subpoenas, the district court correctly granted the motion to quash and disqualified Sarcone from the underlying investigations. This Court should affirm.

## STATEMENT OF THE ISSUES

1.  Whether the district court correctly concluded Sarcone was unlawfully serving as Acting U.S. Attorney when he caused two grand jury subpoenas to issue to OAG;

2.  Whether the district court correctly determined the FVRA prohibits the U.S. Attorney General from using her general delegation authority to install a *de facto* Acting U.S. Attorney; and

3.  Whether the district court abused its discretion by quashing the subpoenas and disqualifying Sarcone from prosecuting or supervising the underlying investigations.

## STATEMENT OF THE CASE

### A. OAG's Investigations into President Trump and His Allies

OAG enforces the laws of the State of New York. That responsibility includes conducting investigations and bringing enforcement actions under state law. The office is currently led by New York Attorney General Letitia James, who was elected in 2018 and reelected in 2022.

This case arises from two OAG enforcement actions. First, in September 2022, after a three-year investigation, OAG filed a complaint alleging that Donald J. Trump—then a private business owner—and his associates had committed widespread financial fraud. OAG asserted that Mr. Trump inflated the value of his assets by as much as $2.2 billion a year. The state trial court ultimately found that Mr. Trump and the other defendants had violated various provisions of New York law. Despite Mr. Trump's attempts to dismiss or enjoin the enforcement action, state and federal courts alike repeatedly concluded that the action was lawful, legitimate, and initiated in good faith. *See Trump v. James*, 2022 WL 1718951, at *12-13, *14, *19-20 (N.D.N.Y. May 27, 2022); *People v. Trump Org., Inc.*, 2022 WL 489625, at *5 (N.Y. Sup. Ct. Feb. 17, 2022);

6

*People v. Trump Org., Inc.*, 169 N.Y.S.3d 612, 614-15 (N.Y. App. Div. 2022); *People v. Trump Org., Inc.*, 38 N.Y.3d 1053, 1054 (N.Y. 2022). The Appellate Division has upheld the trial court's finding that Mr. Trump was liable. *People v. Trump*, 237 N.Y.S.3d 443, 445-46 (N.Y. App. Div. 2025).[3]

Second, in August 2020, OAG filed a lawsuit against the National Rifle Association ("NRA"), which is incorporated as a nonprofit in New York, and its senior executives. There, a lengthy investigation revealed that the NRA had failed to properly administer its assets and that its executives had unlawfully misappropriated millions of dollars in charitable funds for their own use. A jury ultimately returned a verdict against both the NRA and its executives. Like President Trump, the NRA tried to challenge the enforcement action as retaliatory and politically motivated, but courts uniformly rebuffed those attacks. *People v. Nat'l Rifle Ass'n of Am., Inc.*, 203 N.Y.S.3d 255, 261-62 (N.Y. App. Div.

---

[3] Although the Appellate Division vacated the trial court's disgorgement award and its sanctions order, those issues had nothing to do with President Trump's claims of selective enforcement. *See Trump*, 237 N.Y.S.3d at 446 (Moulton, J., concurring) (noting selective enforcement claims had "already been considered, and rejected by th[e] Court").

7

2023); *People v. Nat'l Rifle Ass'n of Am., Inc.*, 171 N.Y.S.3d 782, 786-87 (N.Y. Sup. Ct. 2022).

## B. President Trump's Campaign Against OAG and Attorney General James

In response to OAG's efforts to hold him and his allies accountable, Mr. Trump and his proxies spent years, before and after he was elected President in 2024, disparaging Attorney General James and repeatedly calling for her prosecution in retaliation for OAG's work. In the interest of concision, OAG describes only a representative sample of the attacks, but they are laid out in more detail in the district court briefing. *See* A:0025-28, A:2135-37, A:2316-17.

In April 2019, shortly after OAG began its investigations, President Trump tweeted that the NRA was "under siege" and that Attorney General James was "illegally using the State's legal apparatus to take down and destroy this very important organization." A:1508. Pamela Bondi (who was then Mr. Trump's personal lawyer and later served as U.S. Attorney General) echoed that sentiment, tweeting that what "James did is abhorrent. . . . Instead of focusing on the people of NY who need help, she's targeted Potus [sic] and his family." A:1511. Bondi also railed that Attorney General James "can't get away with this" and "needs

8

to be looked at." A:1332-33.

As the litigation progressed, the attacks grew more strident. In 2023, Mr. Trump protested that OAG was "consumed with the NRA (and me)" and that Attorney General James was "fighting with every ounce of her strength . . . to destroy the NRA, and the Republican Party along with it." A:1520. Between October 2023 and January 2024, he went on a tirade, calling Attorney General James a "Racist scoundrel," repeatedly accusing her of committing "criminal Election Interference" and fraud, and calling for her to be "impeached" or "arrested and punished accordingly." A:1523, A:1526, A:1538, A:1541, A:1544, A:1551, A:1554. Mr. Trump also asserted that the trial judge in his fraud case was "totally controlled by Letitia James and her Thugs" and "intimidated by [her] big, nasty, and ugly mouth." A:1529, A:1560.

After the trial court entered judgment against Mr. Trump in February 2024, he vowed revenge. He reposted comments by Congresswoman Marjorie Taylor Greene asserting that Attorney General James and the trial judge "belong in jail." A:1557. A month later, *Rolling Stone* reported that Mr. Trump had "publicly declared that . . . James should be 'looked at' by the authorities" and that "various lawyers . . .

9

close to [Mr. Trump] ha[d] been crafting specific, novel legal schemes that a Justice Department could use to go after" her if Mr. Trump were reelected. A:1335. As Alina Habba (another of Mr. Trump's personal lawyers, who was later unlawfully appointed as Interim U.S. Attorney in New Jersey) put it in an interview, Mr. Trump's inner circle was sending a message that Attorney General James was "not going to going to get away with it." A:1337. When Mr. Trump returned to office, Habba explained, "he [was] going to clean house." A:1338.

## C.    Sarcone's Appointment and Investigation into OAG

Since his reelection, President Trump has been pursuing the politically motivated retaliation campaign that he promised. Barely a month in, his Administration began installing his political allies in U.S. Attorney's Offices across the country. For example, then-Attorney General Bondi named Habba—who had been trumpeting the Administration's plans to "clean house" not even one year earlier—to serve as Interim U.S. Attorney in the District of New Jersey. *See United States v. Giraud*, 160 F.4th 390, 395 (3d Cir. 2025), *reh'g en banc denied*, Jan. 26, 2026.

Around the same time, Bondi appointed John Sarcone III to serve

as Interim U.S. Attorney for the Northern District of New York under 28 U.S.C. § 546.  A:2075.  Section 546 authorizes the Attorney General to fill a vacant U.S. Attorney position with an interim official for no more than 120 days.  28 U.S.C. § 546(a), (c).  It also provides that if the 120-day period expires and the office remains vacant, "the district court for such district may appoint a United States attorney to serve until the vacancy is filled."  *Id.* § 546(d).  Sarcone began serving as Interim U.S. Attorney on March 17, 2025.  A:2075.

The office was still vacant 120 days later.  On July 14, 2025, at the end of that period, the Board of Judges for the U.S. District Court for the Northern District of New York "decline[d] to exercise the authority granted pursuant to" § 546(d) to appoint a U.S. Attorney.  A:2077. Sarcone's tenure legally lapsed at that point.

The same day, DOJ designated Sarcone as a special attorney under 28 U.S.C. § 515.  A:2087.  The letter designating Sarcone as special attorney purported to authorize him "to conduct in the Northern District of New York, any kind of legal proceedings, civil or criminal, including Grand Jury proceedings, . . . which United States Attorneys are authorized to conduct" for an "indefinite" period.  *Id.*  Simultaneously,

11

the General Counsel for the Executive Office for U.S. Attorneys approved Sarcone's promotion to First Assistant U.S. Attorney on a form indicating that the "[r]eason" for the "[t]emporary appointment" was for Sarcone to "[s]erv[e] as Acting U.S. Attorney for a 210-day period (5 U.S.C. 3346(a)(1))." A:2090-92.

Sarcone sent the appointment letter to the Chief Judge of the Northern District of New York, stating that "by operation of law," he was "now serving as Acting United States Attorney . . . indefinitely." A:2086.

Meanwhile, Sarcone made good on President's Trump's promise to "look[] at" Attorney General James. A:1335. On August 5, 2025, after Sarcone's 120-day interim period under § 546 had expired, OAG was served with two grand jury subpoenas. A:0068-74. The subpoenas were requested by "Acting United States Attorney" Sarcone. A:0068, A:0072. They specified that the records produced "may be sent to" "Acting United States Attorney" Sarcone directly. *Id.* And the cover letters accompanying the subpoenas were signed by Sarcone as "Acting United States Attorney." *Id.* Neither document named any other prosecutor or mentioned Sarcone's alleged "special attorney" or "First Assistant" titles. *Id.*

12

The subpoenas targeted OAG's enforcement actions. The first concerned *New York v. Trump* and the second concerned *New York v. NRA*. A:0068-70, A:0072-74. Each called for the production of "[a]ny and all documents relating to the Subject Case" or "reflecting communications about the Subject Case." A:0070, A:0074. The *Trump* subpoena demanded records going back to 2022, and the *NRA* subpoena demanded records going back to 2020. *Id.*

OAG moved to quash the subpoenas. A:0001. It raised a number of arguments, including that the subpoenas were retaliatory and issued in bad faith, intruded on New York's sovereignty, and infringed on OAG's First Amendment rights. A:0018-19. OAG also argued that the subpoenas must be quashed because Sarcone's appointment as Acting U.S. Attorney was unlawful, and he lacked the authority to request them. A:0019.

### D. Courts Across the Country Have Invalidated President Trump's Defective Appointments

While the motion to quash was pending, President Trump's retaliation campaign against Attorney General James continued. In September 2025, after a five-month investigation into Attorney General James revealed no evidence of wrongdoing, Eric Siebert, the Interim U.S.

13

Attorney for the Eastern District of Virginia, informed DOJ that he was concerned about the viability of bringing charges against her. *United States v. James*, 810 F. Supp. 3d 752, 754-57 (E.D. Va. 2025); A:2169. Siebert also questioned DOJ's case against former FBI Director James Comey, another political opponent of the President's. *United States v. Comey*, 810 F. Supp. 3d 768, 771-74 (E.D. Va. 2025); A:2169. In response, President Trump forced Siebert out, and DOJ installed Lindsey Halligan—a former White House aide with no prior prosecutorial experience—in his place. *Comey*, 810 F. Supp. 3d at 771, 773-74. On the heels of that appointment, President Trump made clear what Halligan had been put in office to do. He continued his attacks against Attorney General James, calling her "SCUM" and a "Complete and Total Disaster" and alleging she had perpetrated a "WITCH HUNT" against him and others. A:2136.

Within three weeks, grand juries had indicted Comey and Attorney General James in separate matters. *James*, 810 F. Supp. 3d at 756-57; *Comey*, 810 F. Supp. 3d at 773-74. Two months later, a district court dismissed the indictments, holding that Halligan had been appointed unlawfully. *See James*, 810 F. Supp. 3d at 754, 768; *Comey*, 810 F. Supp.

14

3d at 771, 787. Following dismissal, DOJ tried—and failed—to secure new indictments against Attorney General James. A:2342-43. It was only after two separate grand juries refused to charge her that DOJ decided to appeal the dismissal of the original indictment Halligan had secured. *Id.*; A:2341.

The court that dismissed the *James* and *Comey* indictments was in good company. Before and after those decisions, courts across the country have repeatedly held that Acting U.S. Attorneys who were appointed under substantially the same scheme as Sarcone were serving unlawfully. *Giraud*, 160 F.4th at 393; *United States v. Ramirez*, 807 F. Supp. 3d 1086, 1114 (C.D. Cal. 2025); *United States v. Ramirez-Martinez*, 2026 WL 113431, at *26 (D.N.M. Jan. 14, 2026); *United States v. Garcia*, 2025 WL 2784640, at *18 (D. Nev. Sep. 30, 2025).

### E. The District Court Grants OAG's Motion to Quash and Disqualifies Sarcone

On January 8, 2026, the district court joined this uniform body of authority and granted OAG's motion to quash, holding that Sarcone was not lawfully serving as Acting U.S. Attorney. SA:001-02, SA:009. DOJ had contended that Sarcone's service was lawful for two reasons. First, the Attorney General designated him the First Assistant, which DOJ

15

argued made him Acting U.S. Attorney under the FVRA's automatic succession provision, 5 U.S.C. § 3345(a). Second, regardless of the operation of the FVRA, DOJ argued that Sarcone's designation as special attorney imbued him with the full powers of a U.S. Attorney.

The district court rejected both theories. The court concluded that only a First Assistant who is serving at the time a vacancy arises assumes the acting role under the FVRA's automatic succession provision. SA:013. Because Sarcone was named First Assistant well after the office went vacant, the FVRA did not authorize his appointment. *Id.* The court also rejected DOJ's special-attorney-designation argument. It concluded that the designation violated the FVRA's prohibition on using general delegation statutes to appoint an acting official. SA:017-18. Accordingly, the court quashed the subpoenas and disqualified Sarcone from participating in the investigations into OAG. SA:020.

DOJ appealed. A:2286. It also sought a stay pending appeal, but the district court denied the motion. Dkt. No. 33 at 2. The court held that DOJ could not show it was likely to succeed on appeal. *Id.* at 4. It explained that the "only appellate decision to address the appointment maneuver at issue"—the Third Circuit's decision in *Giraud*—"affirmed

16

the core legal conclusions" and "upheld a substantially similar remedy." *Id.* It also pointed to the "uniform" consensus among the district courts that have reached the issue. *Id.* The district court was likewise unpersuaded by DOJ's attempt to demonstrate it would be harmed absent a stay. "The Federal Government identifies no concrete hardship from proceeding without Mr. Sarcone on these investigations," the court explained. *Id.* at 7. "Mr. Sarcone has no prior prosecutorial experience, and the Federal Government offers no insight into what unique attributes he brings." *Id.* After finding that the harm to OAG and the public interest also counseled against a stay, the court denied DOJ's motion. *Id.* at 10-11.

By the time the district court resolved the stay motion, even DOJ acknowledges Sarcone could no longer serve as Acting U.S. Attorney under the time limit prescribed by the FVRA. Opening Br. 3 n.1. When a resignation triggers a vacancy and no nomination for the position is pending before the Senate, the FVRA imposes a ceiling of 210 days on acting service. 5 U.S.C. § 3346(a). For Sarcone, that period expired no

17

later than February 10, 2026.[4]  On February 11, 2026, the Board of Judges for the Northern District of New York appointed Donald Kinsella to serve as U.S. Attorney under § 546(d).  Opening Br. 3 n.1.  The day after that, President Trump fired Kinsella.  *Id.*  Accordingly, Sarcone continues to serve unlawfully as the operative head of the Office.  *Id.* President Trump has yet to submit a nominee for U.S. Attorney for the Northern District of New York to the Senate.  SA:003.

## STANDARD OF REVIEW

This Court reviews a district court's resolution of a motion to quash a grand jury subpoena for abuse of discretion.  *In re Grand Jury Subpoenas Returnable Dec. 16, 2015*, 871 F.3d 141, 145 (2d Cir. 2017). Under that standard, legal questions are reviewed de novo and factual determinations are reviewed for clear error.  *United States v. Friedberg*, 558 F.3d 131, 133 (2d Cir. 2009); *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 68-69 (2d Cir. 2003).

---

[4] Arguably, the period expired on September 15, 2025, 210 days after the "date the vacancy occur[ed]" on February 17, 2025, when the last U.S. Attorney for the Northern District of New York stepped down.  *See* SA:003.  But because Sarcone was not lawfully serving after July 14, 2025, when his § 546 appointment expired, that issue does not bear on this appeal.

Abuse-of-discretion review also applies to decisions about disqualifying a prosecutor. *United States v. Badalamenti*, 794 F.2d 821, 828 (2d Cir. 1986); *United States v. Walker*, 243 F. App'x 621, 623 (2d Cir. 2007).

## SUMMARY OF ARGUMENT

Sarcone lacked authority to request the grand jury subpoenas because his appointment to serve as Acting U.S. Attorney violated the FVRA. As the district court correctly held, when a vacancy arises in an office requiring Senate confirmation, the automatic succession provision of the FVRA allows only the incumbent First Assistant to perform the functions and duties of the office. *See* 5 U.S.C. § 3345(a)(1). Because Sarcone was not installed as First Assistant until the office had been vacant for months, the automatic succession provision did not authorize his service. DOJ's contrary arguments misread the statutory text, mangle the FVRA's structure, and misstate the relevant history.

Nor could Sarcone exercise the functions of the U.S. Attorney through his purported designations as "special attorney" and "First Assistant." The FVRA's exclusivity provision—which specifies that an agency cannot use general delegation statutes to designate an acting

19

official—precludes that maneuver. And while DOJ insists the FVRA does not apply because Sarcone was delegated those functions "in a non-acting capacity," the FVRA cannot be circumvented so easily. Sarcone's title is irrelevant. What matters is that he was delegated *all* of the authority of the U.S. Attorney, in blatant violation of the statutory scheme governing acting appointments.

In an attempt to salvage its retaliatory investigations of OAG, DOJ rewrites history and argues that the subpoenas Sarcone sought as Acting U.S. Attorney were valid even if he were improperly appointed because he *could have* sought them as special attorney or First Assistant. The Appointments Clause prohibits this sort of counterfactual justification and requires relief for the violation that actually occurred. In any event, even if Sarcone could rely on other authority, he was never properly appointed to any role.

Because Sarcone lacked authority to seek the grand jury subpoenas or to investigate OAG, the district court correctly quashed the subpoenas and disqualified him from the investigations. Even DOJ concedes that if Sarcone lacked authority, the subpoenas may be quashed, and he may be disqualified.

20

## ARGUMENT

### I.    SARCONE'S APPOINTMENT WAS INVALID

#### A.    The Attorney General Cannot Appoint an Acting U.S. Attorney by Naming a First Assistant After a Vacancy Arises

##### 1.    The Appointment of Acting U.S. Attorneys

The Constitution generally requires that "Officers of the United States" be nominated by the President and confirmed by the Senate. Specifically, the Appointments Clause provides that the President

> shall nominate, and by and with the Advice and Consent of the Senate, shall appoint, . . . Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2. With respect to the appointment of U.S. Attorneys, Congress has required the Executive Branch to follow the default rule and secure Senate confirmation. 28 U.S.C. § 541(a).

As a practical matter, however, Congress has recognized that offices requiring Senate confirmation will sometimes become vacant. As a result, Congress gave the Executive stopgap authority to temporarily fill an office that requires Presidential nomination and Senate

21

confirmation—a "PAS" office—pending confirmation of a new officeholder.

Two different statutes provide mechanisms by which an official may temporarily perform the role of U.S. Attorney. The first is the FVRA. This statute applies to offices across the Executive Branch that require Presidential nomination and Senate confirmation. It is the principal means for temporarily filling those vacancies.

The FVRA establishes three pathways for appointing acting officials. First, the FVRA's automatic succession provision, § 3345(a)(1), specifies that if a vacancy occurs, "the first assistant to the office of such officer shall perform the functions and duties of the office." 5 U.S.C. § 3345(a)(1). Second, the President may override that default rule and slot in someone whom the Senate has previously confirmed for a different office. *Id.* § 3345(a)(2). Third, the President may also override the default rule by elevating an officer or employee of the Executive agency at issue who meets statutorily specified seniority and experience criteria. *Id.* § 3345(a)(3). However chosen, acting officials may serve only for limited periods: "no longer than 210 days beginning on the date the vacancy occurs" or, subject to certain requirements, while a nomination

22

is pending. *Id.* § 3346(a).

The second statute authorizing the selection of temporary U.S. Attorneys is 28 U.S.C. § 546. When an "office of United States attorney is vacant," Congress authorized the Attorney General to appoint an Interim U.S. Attorney for no more than 120 days, as long as the appointee is not someone "whose appointment by the President to that office the Senate refused to give advice and consent." 28 U.S.C. § 546(a)-(c). If those 120 days elapse and the office remains vacant, Congress provided that the district court for the relevant district "may appoint a United States attorney to serve until the vacancy is filled." *Id.* § 546(d).

These pathways to acting service are narrow by design. Although Congress has long authorized reliance on acting officials, it views overuse of the practice as a "threat to the Senate's advice and consent power" and has repeatedly imposed constraints. *SW Gen.*, 580 U.S. at 293-95. Originally, acting officials could serve indefinitely, but as early as 1795 Congress enacted a six-month limit. *Id.* at 294. And while Congress initially authorized the President to select "any person or persons" to serve in an acting capacity, today the FVRA confines his choice to the three categories of existing government officials described above. *Id.*

23

at 295-96. Moreover, except in limited circumstances, even an official who falls in one of those categories cannot serve in an acting role if the President has submitted the person's nomination to the Senate. 5 U.S.C. § 3345(b).

The history of § 546 tells a similar story. In 2006, Congress briefly eliminated the 120-day limit on the Attorney General's ability to name an Interim U.S. Attorney. USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, Title V, § 502, 120 Stat. 192, 246 (2006). But the Attorney General immediately began to abuse the newfound authority, and Congress grew concerned that DOJ was "[b]ypassing the Requirement of Senatorial Advice and Consent." H.R. Rep. No. 110-58, at 6 (2007). Congress restored the time limit one year later, reflecting its commitment to circumscribing the appointment power and insulating U.S. Attorneys from the political winds. *See* Preserving United States Attorney Independence Act of 2007, Pub. L. No. 110-34, § 2, 121 Stat. 224, 224 (2007).

### 2. The FVRA's Automatic Succession Provision Applies Only to the Incumbent First Assistant

Sarcone's purported elevation to Acting U.S. Attorney violated the FVRA because the automatic succession provision applies only to the

24

person serving as incumbent First Assistant at the time the vacancy arises, and Sarcone was not installed as First Assistant until long after the vacancy arose.

Section 3345(a)(1) specifies that if an official in a Senate-confirmed position "dies, resigns, or is otherwise unable to perform the functions and duties of the office, . . . the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity." 5 U.S.C. § 3345(a)(1). As the Third Circuit and other courts have recognized, the provision's text, structure, and history all confirm that only an incumbent First Assistant may assume the duties of a PAS office under § 3345(a).

Beginning with the text, Congress's choice of verbs makes clear that the automatic succession provision is triggered by a "single, immediate occurrence"—when the vacancy begins. *Giraud*, 160 F.4th at 398; *see Ramirez*, 807 F. Supp. 3d at 1096-97; *Garcia*, 2025 WL 2784640, at *6. Both "dies" and "resigns" unequivocally reference the "single instance" when the vacancy happens. *Giraud*, 160 F.4th at 398.

The same is true of the clause "is otherwise unable to perform the functions and duties of the office." Such a general catch-all phrase must

25

be interpreted "in light of any common attributes shared by the specific" words that come before it. *Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246, 252 (2024) (citation modified). Applying that principle to § 3345(a)(1), the "otherwise" clause is "controlled and defined by reference to" its predecessors, "dies" and "resigns." *Id.* (citation omitted). Accordingly, the "otherwise" clause is best understood to describe the same moment that "dies" and "resigns" do—when an officeholder becomes unavailable for continued service. It is then—and only then— when the First Assistant automatically steps in.

Confirming that conclusion, § 3345(a)(1) refers to "*the* first assistant to the office." The "use of the definite article" indicates that the provision covers "generally only one" individual. *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004). And that individual must be the first assistant serving when the vacancy arises, "who automatically assume[s] acting duties" at that time. *SW Gen.*, 580 U.S. at 305.

A comparison between § 3345(a)(1) and the other two paragraphs of § 3345(a) confirms that interpretation. Those provisions specify that "the President (and only the President)" may override the automatic succession provision's default rule and "direct" someone to serve as

26

Acting U.S. Attorney. 5 U.S.C. § 3345(a)(2), (a)(3). The automatic succession provision, by contrast, does not envision any involvement by the President, let alone by the Attorney General. It is "self-executing," *SW Gen.*, 580 U.S. at 303, triggered by the vacancy and not an act of the Executive Branch. It therefore must be the case that only a First Assistant *in office* when the vacancy arises can become the acting official under § 3345(a)(1).

*SW General* provides further support for that interpretation. There, the Supreme Court stated that when the President's chosen acting officer becomes ineligible for acting service under the FVRA, the President has the power to appoint a replacement acting officer under only paragraphs (a)(2) and (a)(3). 580 U.S. at 309. The Court's reasoning indicates that, in that situation, the President has *no* power to appoint an official under paragraph (a)(1)—let alone the sort of unbridled authority DOJ envisions.

The structure of § 3345(a) confirms what the text makes plain. As explained, § 3345(a)(1) embodies the default rule of automatic succession, which controls unless the President overrides it by installing an official who satisfies the narrow criteria specified by Congress. 5 U.S.C.

27

§ 3345(a); *see supra* p. 22; *SW Gen.*, 580 U.S. at 293. DOJ's position cannot be squared with the operation of the statute. It is hard to imagine why Congress would have narrowly defined the set of officials whom the President may designate under paragraphs (a)(2) and (a)(3) if paragraph (a)(1) gave the President and the Attorney General carte blanche to select anyone they like. *See L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 28-29 (D.D.C. 2020) ("One is left to wonder, if Congress had intended . . . such a result, why would it have gone to the trouble of requiring that 'the President (and only the President)' act in order to overcome the default rule and why would it have [so] limited the pool of potential presidential designees . . . ?").

Indeed, DOJ's interpretation of the automatic succession provision would render the FVRA's other methods of naming an acting official essentially superfluous. Under DOJ's reading, in nearly any circumstance where the President could direct an individual to serve as an acting official under paragraph (a)(2) or (a)(3), the President (or for that matter the Attorney General) could designate the same individual to serve as First Assistant, automatically installing that individual as the acting official under paragraph (a)(1). If that were correct, paragraphs

28

(a)(2) and (a)(3), which "account[] for more than half of" the text of § 3345(a), "would lie dormant in all but the most unlikely situations." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). The district court correctly declined to adopt an interpretation that would render "insignificant" such a substantial portion of a statute enacted to constrain presidential discretion. *Id.* (citation omitted); *see Pulsifer v. United States*, 601 U.S. 124, 143 (2024).

The FVRA's history further confirms that, in enacting § 3345(a)(1), Congress did not intend to give the Attorney General free rein to choose who will serve as an Acting U.S. Attorney. In the 1970s and 1980s, the Legislative and Executive Branches fought constantly over the Executive's efforts to bypass the confirmation process by appointing acting officials. *SW Gen.*, 580 U.S. at 294-95. DOJ, in particular, asserted virtually limitless authority to fill vacant offices, notwithstanding the strictures of the Vacancies Act in force at the time. *Id.* at 294. By 1998, approximately 20 percent of offices requiring Senate confirmation were filled by acting officials, "most of whom" had overstayed the Vacancies Act's time limits. *Id.* at 295. "Perceiving a threat to the Senate's advice and consent power," Congress responded to

29

this pattern of Executive overreach by passing the FVRA. *Id.* The FVRA was thus a "reclamation" of the Senate's role in appointments, *SW Gen., Inc. v. NLRB*, 796 F.3d 67, 70 (D.C. Cir. 2015), not a license for agency heads to appoint their allies as acting officers for indefinite periods.

Unsurprisingly, in light of the FVRA's text, structure, and history, courts across the country unanimously agree that § 3345(a)(1) provides for the automatic succession of only the First Assistant who is serving when a vacancy arises. The Third Circuit—the only Court of Appeals that has resolved the issue thus far—held that this interpretation is the "most natural reading" of the statute, "better harmonizes [its] various provisions," and "avoids the oddities that the Government's interpretation would create." *Giraud*, 160 F.4th at 400 (citation omitted). The district courts that have weighed in are in accord. To the last, they have rejected DOJ's contention that the Attorney General may anoint an Acting U.S. Attorney by designating a First Assistant at any time after a vacancy arises. *See Ramirez*, 807 F. Supp. 3d at 1095; *Garcia*, 2025 WL 2784640, at *9; *Ramirez-Martinez*, 2026 WL 113431, at *10; *see also Widakuswara v. Lake*, 2026 WL 638676, at *5 (D.D.C. Mar. 7, 2026); *cf. SW Gen.*, 796 F.3d at 76 ("Although we do not decide its meaning today,

30

subsection (a)(1) may refer to the person who is serving as first assistant *when the vacancy occurs*."); *Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 560 (9th Cir. 2016) (indicating § 3345(a)(1) applies only to the "current" First Assistant when the vacancy arises); *United States v. Naviwala*, 2026 WL 658885, at *15 (D.N.J. Mar. 9, 2026); *L.M.-M.*, 442 F. Supp. 3d at 28-29.

### 3.    DOJ's Counterarguments Fail

None of DOJ's arguments supports the circumvention of the Appointments Clause that DOJ advocates.

DOJ latches on to the fact that § 3345(a)(1) refers to the "first assistant to *the office*" that is vacant, rather than the "first assistant to *the officer*" who has vacated the position.  Opening Br. 20-21.  But the FVRA's use of "office" is fully consistent with the interpretation courts have unanimously adopted, which focuses on the moment the vacancy arises.  As soon as that happens, there is no longer any officer in the position at issue.  It is therefore entirely natural that Congress referred to the "first assistant to the [just-vacated] office."

DOJ also insists that § 3345(a)(1)'s use of the present tense favors its position, Opening Br. 20-21, but as explained above, the phrase "is

31

otherwise unable to perform" must be read together with the words around it, "dies" and "resigns," which "refer to a single instance"—when the vacancy arises, *Giraud*, 160 F.4th at 398 (citing *Fischer v. United States*, 603 U.S. 480, 489-90 (2024)). DOJ insists that, in *Giraud*, the Third Circuit misapplied *Fischer* to interpret the "otherwise" clause, but it is DOJ that muddles basic statutory interpretation. It argues that a list of specific examples limits a catch-all clause only when a contrary interpretation would make the specific examples redundant. Opening Br. 29. But that is not the only reason to read an "otherwise" clause in reference to the words that precede it. A word is also "given more precise content by the neighboring words with which it is associated." *Fischer*, 603 U.S. at 487 (citation omitted). That "avoid[s] ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress.'" *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995) (citation omitted). Here, interpreting "is otherwise unable" to cover "not only . . . the moment that a vacancy begins, but also . . . any future point during that vacancy," Opening Br. 22, would have exactly that effect—expanding the automatic succession provision far beyond what its use of "dies" and "resigns"

32

indicates that Congress intended.

DOJ also makes much of the fact that paragraphs (a)(3) and (b)(1) contain "backward-looking language" that paragraph (a)(1) lacks, Opening Br. 22, but that comparison is inapt. Paragraphs (a)(3) and (b)(1) restrict the President's ability to name acting officials based in part on how long the candidate served in the agency prior to the vacancy. Paragraph (a)(1), by contrast, focuses exclusively on the state of the world when the vacancy occurs. It does not contain similar backward-looking language because it does not impose backward-looking constraints. It is the timing, not the length, of the incumbent First Assistant's tenure that affects whether the First Assistant assumes the acting role. *See Giraud*, 160 F.4th at 399-400.

The final argument DOJ offers about paragraph (a)(1)'s text falls flat as well. DOJ contends that "Congress knows how to limit acting officer status to only incumbent first assistants when it wants to." Opening Br. 26. It cites 5 U.S.C. § 403(h), which defines the term "first assistant" in the context of an Office of the Inspector General to include "an individual who, as of the day before the date on which the Inspector General dies, resigns, or otherwise becomes unable to perform the

33

functions and duties of that position," is serving as First Assistant. 5 U.S.C. § 403(h)(1)(A). But the existence of that provision does not prove Congress meant something different in paragraph (a)(1). That "Congress could have expressed itself more clearly" is no reason to depart from the best reading of a statute. *Pulsifer*, 601 U.S. at 137-38 (citation omitted).[5]

Moreover, one could just as easily flip the argument back at DOJ and contend that Congress knows how to *broaden* a statute to apply throughout the time a vacancy exists, and not only to the single moment when it arises. Take § 546 for instance, which specifies that the Attorney General may appoint an Interim U.S. Attorney "for the district in which the office of United States attorney is vacant." 28 U.S.C. § 546(a). Congress could have similarly specified that the automatic succession

[5] There is also good reason to think that, unlike when the FVRA was passed in 1998, Congress may have felt a need to be specific in 2022, when it enacted the Inspector General statute. Before the FVRA, the Executive Branch had not attempted to install a First Assistant to an already-vacant office under paragraph (a)(1). *See L.M.-M.*, 442 F. Supp. 3d at 27-28. By 2022, the Executive was pushing the envelope on that score, and courts were questioning whether its actions were lawful. *See SW Gen.*, 796 F.3d 67 (declining to resolve the issue in 2015); *L.M.-M.*, 442 F. Supp. 3d at 27-28 (same in 2020); *see also Designation of Acting Assoc. Att'y Gen.*, 25 Op. O.L.C. 177, 179-81 (2001). As a result, it was prudent for Congress to be more specific in 2022.

34

provision applies whenever an office "is vacant." But that is not what § 3345(a)(1) says. *See Giraud*, 160 F.4th at 398 (Congress could have conveyed DOJ's interpretation by using "the present perfect tense (has died, has resigned).").

DOJ's structural arguments fare no better. Most glaringly, DOJ has no response at all to the most obvious structural objection to its position: that it would eviscerate the FVRA's carefully crafted constraints on Executive Branch authority to select Acting U.S. Attorneys (and many other acting officials). Remarkably, DOJ does not dispute that its position would impose no meaningful limits on who can serve in acting positions. That would be a stunning feature for a "default rule" that Congress put in place to limit Executive Branch end-runs around the Constitution's advice-and-consent requirement. *SW Gen.*, 580 U.S. at 293. Congress could not possibly have meant to yield such a substantial part of its constitutional advice-and-consent authority. *See SW Gen.*, 796 F.3d at 70 ("The statute was framed [by its sponsors] as a reclamation of the Congress's Appointments Clause power."); S. Rep. No. 105-250, at 5 (1998) (calling for the FVRA because the "Senate's confirmation power [was] being undermined as never before").

Nor does DOJ offer an adequate response to the surplusage problem the district court identified. It points to three circumstances where, under its reading, a President would be forced to resort to paragraphs (a)(2) and (a)(3) rather than rely on paragraph (a)(1): when the First Assistant position itself requires Senate confirmation; when the First Assistant must be appointed by the agency head but both the agency head and the First Assistant positions are vacant; and when the President simply wants to leave the current First Assistant in place as a subordinate. Opening Br. 31-32. In short, DOJ's view is that the President would need to invoke paragraphs (a)(2) and (a)(3) only if there were some obstacle to choosing whomever he wants as First Assistant.

That response makes no sense. The notion appears to be that Congress established, as a baseline, that the President could install anyone in an acting role by arranging for them to be slotted in as First Assistant. But if for some reason the President could not—or did not want to—have a new First Assistant installed, *only then* would paragraphs (a)(2) and (a)(3) impose strict limits on his choice for the top job. In other words, the extent to which the President's choice of an acting agency head is constrained would turn on the fortuity of whether his

36

choice of First Assistant is also constrained, including by his own choice not to elevate an incumbent First Assistant. There is no reason to think Congress would have intentionally adopted such a convoluted scheme.

In all events, DOJ's ability to dream up edge-case hypotheticals gets it nowhere. The canon against surplusage counsels against an interpretation that would render key statutory language "largely superfluous," even if the proponent of that interpretation can dream up rare scenarios in which the language would have a role—and that is precisely the case under DOJ's interpretation. *See City of Chicago v. Fulton*, 592 U.S. 154, 159 (2021); *Giraud*, 160 F.4th at 399 (rejecting DOJ's attempt to overcome superfluity because the circumstance "when the first assistant job itself is a PAS office . . . would seem to be a rare circumstance compared to first assistant jobs that are not PAS offices").

Striking out on text and structure, DOJ turns to legislative history, but fails there as well. When the "plain text" and the "context in which the statutory terms are used" are "unambiguous," the "judicial inquiry is complete." *Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 418 (2d Cir. 2022) (citation omitted). That is true here, so there is no need to consult

37

the legislative history.[6]

To the extent this Court does review the legislative history, however, it should reject DOJ's misleading account. To be sure, an early version of the automatic succession provision specified that if a Senate-confirmed officer departs, "the first assistant of such officer" automatically assumes the acting role, S. Rep. No. 105-250, at 25, whereas the final version provides that "the first assistant *to the office* of such officer" steps up, 5 U.S.C. § 3345(a)(1) (emphasis added); *see* Opening Br. 23. As DOJ recounts it, that tiny language tweak was a "critical change" that Congress adopted for the express purpose of eliminating the requirement that only incumbent First Assistants could serve as acting officers under paragraph (a)(1). Opening Br. 25. DOJ also claims this revision addressed Senator Joseph Lieberman's concern that the proposed language unduly "restricted acting service to

---

[6] As the Third Circuit explained, the "statutory history" described above is "the sort of textual evidence everyone agrees can sometimes shed light on meaning." *Giraud*, 160 F.4th at 400 n.3 (quoting *BNSF Ry. Co. v. Loos*, 586 U.S. 310, 329 (2019) (Gorsuch, J., dissenting)). But not every source of statutory or legislative history is created equal. And the sort of evidence DOJ relies on is far less powerful. It consists of a Senate Report and floor statements—classic examples of materials whose "mining . . . is disfavored as a statutory interpretation strategy." *Id.* (citation omitted).

38

incumbent first assistants." *Id.* at 25-26.

That, however, is not what happened. DOJ omits any mention of the statements in the legislative history unequivocally explaining that the insertion of the phrase "to the office" was housekeeping that was not intended to alter the provision's meaning. S. Rep. No. 105-250, at 12 (revision "continued" the "practice under [then-]current law"); 144 Cong. Rec. S12822 (daily ed. Oct. 21, 1998) (statement of Sen. Thompson) ("[T]he change in wording is not intended to alter case law on the meaning of the term 'first assistant.'"). Nor does DOJ mention that Senator Lieberman ultimately changed his mind and supported the legislation because the "final version of the bill well addresse[d] th[e] problem by offering the President the option to choose any senior agency staff who has worked at the agency for at least 90 days." 144 Cong. Rec. S12861 (daily ed. Oct. 21, 1998). It was the addition of paragraph (a)(3)—not the stylistic revision of paragraph (a)(1)—that won his vote.

Finally, DOJ invokes the Executive Branch's supposedly "routine[]" and "longstanding" practice of filling Senate-confirmed positions that become vacant before noon on Inauguration Day by appointing new First Assistants hours later. Opening Br. 27. But it identifies a grand total of

39

three appointments, all within the last twenty years. Those examples do not advance DOJ's cause. All three post-date the FVRA's enactment so they shed no light on what Congress intended when it enacted the statute. And here, as in earlier litigation, DOJ has not "identif[ied] a single example of a post-vacancy first assistant serving in an acting capacity prior to enactment of the FVRA." *L.M.-M.*, 442 F. Supp. 3d at 27-28; *see Giraud*, 160 F.4th at 400.

Nor do DOJ's three examples come anywhere close to establishing the sort of widespread post-enactment practice that might inform the proper interpretation of § 3345(a)(1). Courts require *far* more before they will infer that Congress's failure to curtail an Executive practice amounts to acquiescence. *See Zuber v. Allen*, 396 U.S. 168, 185 n.21 (1969) ("Congressional inaction frequently betokens unawareness, preoccupation, or paralysis."). In *SW General*, for example, the National Labor Relations Board identified 112 examples of nominations that were consistent with its interpretation of the FVRA. 580 U.S. at 308. The Court rejected the Board's view anyway. *Id.* It explained that "[h]istorical practice" was "too grand a title for the Board's evidence" given the thousands of nominations the Senate had considered since the

40

FVRA's passage. *Id.* DOJ's evidence here is orders of magnitude smaller still, and it is far from showing either a "routine" or "longstanding" practice. It thus falls well short of the sort of "voluminous historical record" needed to suggest Congress was aware of and endorsed the Executive Branch's post-enactment activities. *Id.*[7]

## B. The Attorney General Cannot Appoint a *De Facto* Acting U.S. Attorney via Delegation

Because Sarcone's appointment did not comply with the FVRA, his service was unlawful. His designations as special attorney and First Assistant cannot cure that defect. DOJ may not use general delegation statutes, such as the authority to name a special attorney, to install a *de facto* Acting U.S. Attorney in defiance of the FVRA's clear limits. And

---

[7] DOJ's citation to opinions from the General Accounting Office ("GAO") and the Office of Legal Counsel ("OLC") does not advance its cause. *See* Opening Br. 27-28 (first citing Letter from Victor S. Rezendes, Managing Director, Strategic Issues, GAO to U.S. Senators Joseph Lieberman and Dan Burton (Dec. 7, 2001); and then citing 25 Op. O.L.C. at 179-81). Neither opinion is entitled to any deference. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 396 (2024); *Bowsher v. Merck & Co., Inc.*, 460 U.S. 824, 837 (1983). And neither is persuasive. The GAO letter contains no reasoning. And while the OLC opinion offers two arguments, one is wrong for the reasons described above, *see supra* pp. 31, 38-39, and the other is wrong because it is predicated on an interpretation of the FVRA that *SW General* overruled, *see* 580 U.S. at 305.

41

DOJ may not evade *that* rule by insisting Sarcone was merely a non-acting official—i.e., a special attorney or the First Assistant—exercising the functions and duties of the office. Adopting DOJ's position would obliterate the separation-of-powers principles that the FVRA was enacted to protect.

### 1. The FVRA Prohibits the Use of a Special Attorney Designation to Appoint an Acting U.S. Attorney

The FVRA's exclusivity provision prohibits the Executive Branch from skirting its requirements by using general delegation authority to name acting officers. It specifies that "[s]ections 3345 and 3346 are the exclusive means for temporarily authorizing an acting official" to fill a Senate-confirmed role unless a different statute "expressly" authorizes another designation method or the President makes a recess appointment. 5 U.S.C. § 3347(a). The provision also states that a statute "providing general authority . . . to delegate duties" is not sufficient to excuse an agency head from adhering to the FVRA. *Id.* § 3347(b).

As courts across the country have repeatedly held, those statutory directives prohibit the Attorney General from using her "general authority . . . to delegate duties"—including her authority to designate

42

special attorneys—to install an Acting U.S. Attorney. *See Giraud*, 160 F.4th at 403 (quoting 5 U.S.C. § 3347(b)); *Ramirez*, 807 F. Supp. 3d at 1103-04; *Garcia*, 2025 WL 2784640, at *14; *Ramirez-Martinez*, 2026 WL 113431, at *16-17.

A contrary conclusion would make it far too easy for the Attorney General to circumvent the FVRA and encroach on the Senate's advice-and-consent power. *Any* attorney could be named to fill an acting role—whether or not they ever served as First Assistant, 5 U.S.C. § 3345(a)(1), attained Senate confirmation, *id.* § 3345(a)(2), or even worked within the U.S. Attorney's Office or DOJ, *id.* § 3345(a)(3). Indeed, that is exactly what DOJ has been doing since the Administration began. Worse still, DOJ's interpretation would make the FVRA's time constraints a dead letter for U.S. Attorneys. Special attorney designations are not time bound in the way that acting-official designations are. *See id.* § 3346(a)(1). That would not merely eliminate any FVRA constraint on the appointment of acting U.S. Attorneys and subsume 28 U.S.C. § 546; it would raise grave constitutional concerns. *See SW Gen.*, 580 U.S. at 313 & n.1 (Thomas, J., concurring) (Appointments Clause issues arise when appointments are neither "special" nor "temporary" (citation

43

omitted)).

## 2. DOJ Cannot Sidestep the Exclusivity Provision by Relabeling Sarcone a Non-Acting Official

DOJ insists that the FVRA's exclusivity provision does not apply to Sarcone's special attorney designation. According to DOJ, that provision applies to acting officials only, and in his role as special attorney, Sarcone was merely exercising the powers of a U.S. Attorney "in a non-acting capacity." Opening Br. 44-46. The facts and the law belie that spurious contention.

For purposes of the FVRA, an "acting official" is one who carries out the responsibilities of the officeholder on a short-term basis. That is clear from § 3345(a), which defines who may serve as an "acting officer" by reference to who may "perform the functions and duties" of the office "temporarily in an acting capacity." 5 U.S.C. § 3345(a)(1)-(3). It is also clear from the meaning of "acting," which is "[t]emporarily assuming the duties of another." *Acting*, Webster's Third New International Dictionary 13 (1993). It is undisputed that DOJ purported to delegate all functions and duties of the U.S. Attorney to Sarcone. *See* A:2087 (appointment letter); A:2247 (DOJ stating at the motion-to-quash hearing that Sarcone was delegated "all of the non-exclusive powers of the U.S. Attorney's

44

Office" and that said office lacks "exclusive functions"). It is also undisputed that Sarcone was performing those functions and duties when he sought the grand jury subpoenas targeting OAG.

It makes no difference whether Sarcone's special attorney designation came with an "acting" label (which, in any event, it did). Nothing in the FVRA supports distinguishing between an acting official performing the functions and duties of an office and an official who performs those same functions and duties without an "acting" title. *See Giraud*, 160 F.4th at 404. And that makes sense, because allowing mere labeling to be determinative would eviscerate the FVRA. Under DOJ's view, any time an agency head has general delegation authority, she can ignore the FVRA altogether and fill a vacancy with the individual of her choice. All she would have to do is delegate the powers of the office to that individual without using the word "acting." That would leave § 3347(b), the bar on using general delegation statutes to designate acting officials, with little functional effect, and it would leave § 3347 with *no* functional effect where the relevant office lacks exclusive functions—a surprising result for a provision enacted to ensure that agencies cannot assert "independent authority" outside the FVRA "to

45

temporarily fill vacant offices." *SW Gen.*, 580 U.S. at 294.

The notion that Sarcone was serving in a "non-acting capacity" in his special attorney role is also irreconcilable with the district court's factual findings. The district court found that the designation was an "attempt to use general delegation to create an Acting U.S. Attorney." SA:019. That finding must be upheld unless it is "clearly erroneous," *Friedman*, 350 F.3d at 68, and the record amply supports it. The timing clearly indicates that, after the judges of the Northern District of New York refused to approve Sarcone's continued service as U.S. Attorney, DOJ pivoted to a special attorney designation to extend his tenure. *See* A:2087. DOJ purported to grant him the full powers of the Office. *See supra* pp. 44-45; A:2087-88; A:2247. And the paperwork finalizing his appointment eliminates any doubt—DOJ did not even try to conceal that the "[r]eason" for the personnel action was to install Sarcone as Acting U.S. Attorney. A:2092.

On this record, the district court's finding that Sarcone's special attorney designation was intended to install him as Acting U.S. Attorney was not erroneous, let alone clearly so. The designation was a key step in a "single series of moves" that DOJ "made with the express goal of

46

installing [him] as the Acting United States Attorney." *Giraud*, 160 F.4th at 403. The district court correctly determined that this was not a mere special attorney designation but cover for an effort to circumvent the FVRA. *See* SA:019; *see also Giraud*, 160 F.4th at 403; *Naviwala*, 2026 WL 658885, at *23 (rejecting argument that U.S. Attorney General had merely delegated authority instead of "creating a *de facto* United States Attorney" as "a rhetorical smokescreen").[8]

DOJ resists this conclusion, arguing that it "ignores that there is [a] fundamental difference" between an Acting U.S. Attorney and a First Assistant or special attorney. Opening Br. 52. DOJ insists that "the former is automatically vested with all the powers of the office, while the latter has only those powers that have been and can be delegated." *Id.* (emphasis omitted). But two sentences later, DOJ criticizes OAG for "identif[ying] no power wielded by Mr. Sarcone that is not lawfully delegable to him." *Id.* at 53. That gives away the game. DOJ takes the

---

[8] Events since the district court's decision have only confirmed that Sarcone purports to serve as the Acting U.S. Attorney. As DOJ notes, the judges of the Northern District of New York appointed a U.S. Attorney in February pursuant to 28 U.S.C. § 546(d). Opening Br. 3 n.1. The President fired him the next day, immediately re-elevating Sarcone. *Id.*

view that all the powers of the U.S. Attorney can be delegated—*and have been delegated*—to Sarcone. *See supra* pp. 44-45; Opening Br. 52-53. The "fundamental difference" DOJ identifies between an Acting U.S. Attorney and Sarcone is no difference at all.[9]

None of that is to say that the FVRA forecloses all delegations of authority. To the contrary, the FVRA usually allows otherwise lawful delegations. DOJ cites various authorities recognizing this general point—that, in a vacuum, if the agency head delegates a non-exclusive power to a subordinate, the FVRA does not prevent the subordinate from exercising that power. *See, e.g.*, *Schaghticoke Tribal Nat. v. Kempthorne*, 587 F.3d 132, 135 (2d Cir. 2009) (upholding delegation of power to recognize Indian tribe); *Arthrex, Inc. v. Smith & Nephew*, 35 F.4th 1328, 1332 (Fed. Cir. 2022) (upholding delegation of power to order rehearing of patent decision); *cf. Gonzales & Gonzales Bonds & Ins. Agency v. DHS*,

---

[9] Although the district court separately found that the U.S. Attorney's power to seek the disclosure of tax return information under 26 U.S.C. § 6103(i)(1)(A)(i) is non-delegable and denied Sarcone's application for such information, that does not alter the analysis. *See In re Order to Authorize Disclosure of Tax Returns*, 2026 WL 63331, at *3 (N.D.N.Y. Jan. 8, 2026). Regardless of what DOJ *could* lawfully do, it purported to delegate the full range of the U.S. Attorney's powers in Sarcone's special attorney designation.

107 F.4th 1064, 1073 (9th Cir. 2024); *Kajmowicz v. Whitaker*, 42 F.4th 138, 150 (3d Cir. 2022); *Guidance on Application of Fed. Vacancies Reform Act of 1998*, 23 Op. O.L.C. 60, 72 (1999).

As the district court observed, while that proposition "is true," it "does not apply here." SA:019. Sarcone's special attorney designation was not a legitimate delegation of "specific, nonexclusive duties"; it was a transparent attempt to "vest" all of the "authority of the U.S. Attorney" in him. *Id.* His designation violates the FVRA precisely because DOJ has purported to delegate the full suite of an office's powers in order to create the functional equivalent of an acting official outside the FVRA's framework. None of the cases DOJ cites supports that lawless maneuver.[10]

While DOJ insists this conclusion would "cripple the operation of the federal government," Opening Br. 43 (citation omitted), that objection

---

[10] Even if *Arthrex* could be read to approve such a delegation, the Federal Circuit's analysis rested on an erroneous premise: that the FVRA's exclusivity provision prohibits only the delegation of "non-delegable duties." 35 F.4th at 1338. As the Third Circuit explained in detail, § 3347(b) does not distinguish between delegable and non-delegable duties; rather, it prohibits the abuse of delegation statutes to install "*de facto*" officials. *Giraud*, 160 F.4th at 403-05.

49

is badly overstated and, ultimately, irrelevant. Although the "universe of delegable . . . duties" of Senate-confirmed officers is indeed "expansive," *id.* (citation omitted), the only issue before this Court concerns a purported delegation of the *entirety* of an officer's powers. The Court need not decide whether more modest delegations implicate the FVRA.

Even if delegations like Sarcone's special attorney designation were commonplace, that would not make them lawful. That a "given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to" the separation of powers, *Bowsher v. Synar*, 478 U.S. 714, 736 (1986)—especially in the context of the Appointments Clause and the FVRA. Complying with the FVRA is not supposed to be easy. The statute was designed to be cumbersome to "encourag[e] presidents to submit nominees in a timely fashion." *Hooks*, 816 F.3d at 564 (quoting S. Rep. No. 105-250, at 5). It was not designed to open the floodgates to unconfirmed officials like Sarcone indefinitely serving as officers of the United States.

50

### C. Permitting DOJ's Maneuver Would Embrace the Primary Evil the FVRA and the Appointments Clause Were Meant to Prevent

At the end of the day, the district court correctly called out DOJ's gambit for what it was: a brazen attempt to cut out the Senate's constitutional advice-and-consent role and install supine U.S. Attorneys willing to carry out the President's unconstitutional campaign of vindictive prosecutions.

A contrary conclusion would make a mockery of the Appointments Clause principles that undergird the FVRA. The FVRA was passed in response to a "perceiv[ed] . . . threat" to the Senate's advice-and-consent power. *SW Gen.*, 580 U.S. at 295. Accordingly, courts routinely read the statute's provisions to embody the values of the Clause and to reinforce its limits. *See, e.g.*, *Hooks*, 816 F.3d at 564; *L.M.-M.*, 442 F. Supp. 3d at 29; *Asylumworks v. Mayorkas*, 590 F. Supp. 3d 11, 24 (D.D.C. 2022). Applying those principles here requires rejecting each of DOJ's attempted justifications for its circumvention of the FVRA. Any other result would reduce the Appointments Clause to a mere "matter of 'etiquette or protocol.'" *Edmond*, 520 U.S. at 659.

Indeed, upholding Sarcone's designation to perform the functions

51

and duties of the U.S. Attorney—whether in an acting position or otherwise—would be particularly problematic because the Appointments Clause was included in the Constitution as a critical safeguard against the very vice that the facts of this case present. The Framers viewed the Clause as an "excellent check upon a spirit of favoritism in the President." *SW Gen.*, 580 U.S. at 293 (citation omitted). They feared that an Executive who enjoyed an unlimited power of appointment "would be governed much more by his private inclinations" than he would if forced to put his nominee to the test of Senate confirmation—that he might choose candidates for their willingness to yield to his whims rather than their merit. The Federalist No. 76, at 457; *see SW Gen.*, 580 U.S. at 293. In other words, they were concerned about precisely what President Trump has tried to do here. President Trump does not seem to be remotely concerned with complying with the Appointments Clause or the FVRA. He has flouted their requirements across the country. And with the perceived freedom to select anyone he wishes for official roles, he has repeatedly prioritized one qualification above all else: a willingness to pursue his personal vendettas with enthusiasm and without compunction. Perhaps most dangerous of all, he has done so in the

52

context of naming U.S. Attorneys, who wield an "immense power to strike at citizens, not with mere individual strength, but with all the force of government itself." Jackson, *supra*, at 3 n.1.

This Court should not countenance that maneuver just because DOJ gave Sarcone multiple titles to try to cover its bases. The Appointments Clause, and the separation-of-powers principles it promotes, "deal[ ] with substance, not shadows." *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 325 (1867). This Court should not permit DOJ to "do indirectly what [it] cannot do directly," *Trump v. United States*, 603 U.S. 593, 631 (2024)—appoint a statutorily and constitutionally unqualified individual to stand in for the U.S. Attorney for the Northern District of New York.

## II. THE DISTRICT COURT CORRECTLY QUASHED THE SUBPOENAS AND DISQUALIFIED SARCONE

Sarcone sought the grand jury subpoenas in his role as Acting U.S. Attorney, to which he had no valid claim, and thus the district court properly quashed the subpoenas as *ultra vires* acts and disqualified him from participating in the underlying investigations. Attempting to rewrite history, DOJ argues that even if Sarcone were not properly appointed as Acting U.S. Attorney, the district court's order was

53

erroneous because Sarcone *could have* sought the subpoenas in his capacity as special attorney or First Assistant. But whatever Sarcone *might have* done has no bearing on the analysis of what he actually did here. Contrary to DOJ's cavalier assertion, Sarcone's claim to the Acting U.S. Attorney role was no "clerical error[]." Opening Br. 60. It was a purposeful and blatant violation of the Appointments Clause and the principles it protects.

Even if this Court were to entertain DOJ's counterfactuals, Sarcone never validly served as a special attorney or as First Assistant, either. Because Sarcone caused the subpoenas to issue without lawful authority, the district court correctly quashed the subpoenas and disqualified him.

### A. Sarcone Acted Without Lawful Authority When He Sought the Subpoenas

DOJ does not contest that Sarcone requested the subpoenas under his purported authority as Acting U.S. Attorney. He was not subtle in making the point. "In six pages," the district court observed, "the two subpoenas and their supporting materials identify Mr. Sarcone as 'Acting U.S. Attorney' six different times." SA:022; *see* A:0068-74. He requested the subpoenas as Acting U.S. Attorney, he signed the cover letters as Acting U.S. Attorney, and he sought the delivery of responsive documents

54

to himself as Acting U.S. Attorney. A:0068-73. Across the investigations, Sarcone never once referred to himself as First Assistant or special attorney. A:2242. And because Sarcone's appointment as Acting U.S. Attorney violated the FVRA and the Appointments Clause, he acted without lawful authority.

The Court need not consider DOJ's argument that Sarcone *could have* sought the subpoenas in another capacity, as an improperly requested subpoena cannot be upheld on the ground that it might have been properly issued. *See In re Grand Jury Proceeding (Oberlander)*, 971 F.3d 40 (2d Cir. 2020); *cf. Naviwala*, 2026 WL 658885, at *21. In *Oberlander*, this Court refused to enforce a subpoena unlawfully sought for a grand jury whose term had expired, even though another grand jury empaneled for the same investigation could have lawfully obtained the same information. 971 F.3d at 50. There, as here, the possibility of a legal workaround did nothing to vitiate the illegality of the improper subpoena. As the district court concluded, "[w]hen the Federal Government seeks to invoke the district court's coercive power, it must do so based on lawful authority, not by asking courts to treat an unauthorized subpoena as interchangeable with a valid one." SA:023.

55

DOJ cannot distinguish *Oberlander* by arguing that the subpoena there was uniquely invalid from its inception. Opening Br. 60. While the subpoenas here did not suffer from the same defect as the subpoena in *Oberlander*—an expired grand jury—they too were invalid from their inception because they were sought by someone who lacked lawful authority. Indeed, courts of appeals (including this one) routinely recognize that part of a district court's duty under Rule 17 is to ensure that "the grand jury, a body operating peculiarly under court supervision, is not misused by the prosecutor," *In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*, 767 F.2d 26, 29 (2d Cir. 1985) (citation omitted), because, as a matter of practice, federal prosecutors issue grand jury subpoenas with no involvement from the grand jury at all, *see First Nat'l Bank of Tulsa v. DOJ*, 865 F.2d 217, 220 (10th Cir. 1989); *Doe v. DiGenova*, 779 F.2d 74, 80 & n.11 (D.C. Cir. 1985). Accordingly, as in *Oberlander*, the legal error here (misuse of the grand jury process by someone without lawful authority) invalidates the subpoenas—it does not prompt a hypothetical do-over.

This principle is of utmost importance here because, far from being a mere "clerical or typographical error[]," Opening Br. 61, Sarcone's

56

choice to invoke the title of Acting U.S. Attorney without lawful authority is a direct affront to the Appointments Clause and the principles it safeguards. As the Supreme Court has recognized, the Appointments Clause "is among the significant structural safeguards of the constitutional scheme." *Edmond*, 520 U.S. at 659; *see SW Gen.*, 580 U.S. at 317 (Thomas, J., concurring) (Appointments Clause is not "an empty formality" that the Executive Branch may disregard "for the sake of administrative convenience or efficiency"). For that reason, "one who makes a timely challenge to the constitutional validity of the appointment of an officer . . . is entitled to relief" by having the action of the improperly appointed officer invalidated. *Lucia v. SEC*, 585 U.S. 237, 251 (2018); *see Collins v. Yellen*, 594 U.S. 220, 279 (2021) (Gorsuch, J., concurring in part) ("[R]eal people are injured by actions taken without lawful authority," and constitutional protections do not turn on "some guessing game about what might have transpired in another timeline."). Here, that means quashing the subpoenas Sarcone unlawfully sought as Acting U.S. Attorney regardless of whether he could have sought them in some other role.

DOJ claims that recent district court decisions support its view that

57

an improperly appointed Acting U.S. Attorney can nevertheless assert the same authority under a different title, Opening Br. 56-58, but it identifies no persuasive (much less binding) authority to support that counterintuitive proposition.

In *Ramirez* and *Ramirez-Martinez*, district courts failed to stop DOJ's unlawful efforts to evade the FVRA and the Appointments Clause, as they disqualified improperly appointed Acting U.S. Attorneys but allowed them to continue supervising prosecutions under the title of "First Assistant." The courts did so despite their awareness of the problems with their approach. In *Ramirez-Martinez*, the court acknowledged the "apparent attempt" by DOJ "to circumvent the term limitations of the FVRA and § 546(c)" through a First Assistant designation. 2026 WL 113431, at *18.[11] In *Ramirez*, the court emphasized that DOJ "should not be able to accomplish effectively what the statute says it cannot do outright" and expressed concern that it was

---

[11] In any event, *Ramirez-Martinez* is distinguishable because the purported First Assistant there was a "career official" with service spanning "multiple executive administrations," so the court could not say that "the only purpose" of his designation was to circumvent the FVRA. 2026 WL 113431, at *17. Here, where Sarcone had no prior prosecutorial experience whatsoever, there is no other possible purpose.

58

offering "little remedy at all" for the appointments violation DOJ had committed. 807 F. Supp. 3d at 1114 (citation omitted).[12]

These misgivings were not mere policy quibbles, but fundamental errors in those courts' legal analysis. As explained above, the Appointments Clause and the FVRA both prohibit DOJ's attempts to smuggle in federal authority through a backchannel. *See supra* Sections I.B-C. In response to these violations, the courts in *Ramirez* and *Ramirez-Martinez* were obligated to invalidate the actions of the improperly appointed officials. *See supra* pp. 55-57; *Lucia*, 585 U.S. at 252. There is no reason for this Court to repeat those district courts' mistakes.

## B. Sarcone Was Never a Special Attorney or First Assistant

Even if this Court were to consider DOJ's counterfactual argument, Sarcone was never properly appointed as a special attorney or First

---

[12] The only other case DOJ cites in support of its theory, *United States v. Ndissi*, 2026 WL 318836 (D. Vt. Feb. 5, 2026), is entirely beside the point. The district court in *Ndissi* did not allow any official to continue service. It merely declined to dismiss an indictment signed by three prosecutors, all of whom were lawfully serving at the time. *Id.* at *7. As the court explained, this case is "easily distinguishable." *Id.* at *4.

Assistant. His designation as a special attorney did not comply with the statutory requirements, and he was not an assistant to anyone.

### 1. Sarcone Was Not a Special Attorney

Sarcone was not a special attorney because his appointment did not comply with the requirements of 28 U.S.C. § 515: (1) the delegation was not executed by the Attorney General herself; and (2) the delegation included no specific direction of what powers Sarcone could exercise as a special attorney.

Under § 515, a special attorney must be "specifically directed *by the Attorney General*," 28 U.S.C. § 515(a) (emphasis added), but the Attorney General gave no such direction here. The letter designating Sarcone as a special attorney was signed by an Assistant Director of Human Resources, not the Attorney General. A:2087-88.[13]

---

[13] In a footnote in its statement of facts, DOJ claims that the Attorney General "ratified" Sarcone's designation. Opening Br. 10 n.5. That afterthought, which DOJ does not even attempt to cast as an argument, warrants no attention from this Court. *See United States v. Aquart*, 912 F.3d 1, 15 n.5 (2d Cir. 2018). In any event, there was no valid ratification of Sarcone's designation. Ratification "cannot retroactively bequeath officer status to a non-officer." *Willie v. Lutnick*, 158 F.4th 539, 551 n.11 (4th Cir. 2025). Yet that is exactly what the Attorney General tried to do in transforming Sarcone from a private citizen into a special attorney. Nor can ratification "give legal significance to an act which was a nullity

*(continued on the next page)*

60

Sarcone's appointment was also invalid because § 515 does not authorize the kind of all-encompassing delegation DOJ attempted here. The statute provides that special attorneys "may, when *specifically directed*," conduct the types of legal proceeding that U.S. attorneys are authorized to conduct. 28 U.S.C. § 515(a) (emphasis added). Specific direction refers to a direction that is "[p]recisely formulated or restricted." *Specific*, Webster's New International Dictionary 2005 (1910). Here, DOJ granted Sarcone "indefinite" authority to undertake "any kind of legal proceedings, civil or criminal, including Grand Jury proceedings, . . . which United States Attorneys are authorized to conduct." A:2087. Whatever precision § 515 may require, a direction to exercise the full powers of the U.S. Attorney indefinitely does not suffice.

Courts have interpreted § 515 to exclude just the type of delegation that DOJ asserts. In *Naviwala*, the court held that "the text of section 515, read in context, indicates that it cannot include all of the powers of a United States Attorney." 2026 WL 658885, at *35. Similarly, the court

---

from the start." *Newman v. Schiff*, 778 F.2d 460, 467 (8th Cir. 1985). Without specific direction, Sarcone could not be a special attorney. *See infra* pp. 61-63. A stamp of approval by the Attorney General cannot repair that illegality.

in *United States v. Weiner*, 392 F. Supp. 81 (N.D. Ill. 1975), rejected the notion that special attorneys could step into the shoes of U.S. Attorneys under § 515. Special attorneys, the court observed, simply "do not have the power or practical ability to usurp the function of a local United States Attorney." *Id.* at 86. Indeed, DOJ has conceded that courts have never approved a § 515 delegation as broad as the one it seeks: in *Naviwala*, DOJ acknowledged "it was not aware of any case dealing with such a delegation 'that was coextensive with the authority of a statutorily created PAS office.'" 2026 WL 658885, at *40 (citation omitted).

DOJ identifies no such delegation here either. It relies on *In re Persico*, 522 F.2d 41 (2d Cir. 1975), but that case reinforces the bounds on the authority that special attorneys may assert. *Persico* upheld a limited grant of authority to a special attorney assigned to a strike force targeting organized crime. Although that attorney was delegated power to conduct a grand jury inquiry "to the same extent as the United States Attorney," his authority outside of a grand jury inquiry was otherwise broadly restricted. *Id.* at 56-57. "All indictments, prosecutions, memoranda, immunity authorization requests, wiretap applications, and *nolle prosequis*" required review and approval from the U.S. Attorney

62

before they were filed. *Id.* at 51. As a result, the special attorney had "little more freedom to rove than a cog in the clock on the courthouse lobby wall." *Id.* at 46. Thus, far from overtaking the role of a U.S. Attorney, as Sarcone attempted to do here, the special attorney had authority analogous to that "held by assistants to a United States Attorney." *Id.* at 63; *see Naviwala*, 2026 WL 658885, at *39. Sarcone's far broader claimed authority—to oversee the entire U.S. Attorney's Office—cannot be the "specific direction" required by § 515.

### 2. Sarcone Was Not a First Assistant

Sarcone likewise never served as a First Assistant U.S. Attorney because his designation was invalid.

Under DOJ regulations, the title of First Assistant attaches to the principal deputy to the U.S. Attorney, or, if there is none, to the person "whom the Attorney General designates in writing." 28 C.F.R. § 0.137(b). Here, after DOJ human resources staff purported to appoint Sarcone as a special attorney, the General Counsel of the Executive Office for U.S. Attorneys purported to give him a "promotion" to First Assistant. A:2090; *see* A:2087-88, A:2095. The Attorney General, however, purported to designate Sarcone as First Assistant only in October, after this litigation

63

had begun.[14]  *See* A:2095.  Accordingly, Sarcone's "promotion" to First Assistant was invalid when he requested the subpoenas.

Even setting that defect aside, Sarcone's designation as First Assistant was ineffective for another, independent reason.  As the court explained in *L.M.-M. v. Cuccinelli*, a First Assistant under the FVRA must be an "assistant" to a principal.  442 F. Supp. 3d at 25.  "[U]nder any plausible construction," the word "assistant" refers to "a role that is, in some manner and at some time, subordinate to the principal."  *Id.*; *see Assistant*, Webster's Third New International Dictionary 132 (defining "assistant" as "one who acts as a subordinate to another or as an official in a subordinate capacity").  It follows that the "first assistant" is the "senior or principal assistant to the official or office at issue."  *L.M.-M.*, 442 F. Supp. 3d at 26; *see First*, Webster's Third New International Dictionary 856 (defining "first" as "foremost in rank" or "chief").

Sarcone does not fall anywhere within that definition.  Like the

---

[14] As explained above, DOJ's assertion that the Attorney General ratified Sarcone's designation fails.  *See supra* p. 60 n.13.  Ratification cannot retroactively grant Sarcone the title of First Assistant, *see Willie*, 158 F.4th at 551, nor can it correct his failure to serve in a legitimate First Assistant role, *see infra* pp. 64-65; *Newman*, 778 F.2d at 467.

purported First Assistant in *L.M.-M.*, Sarcone "was assigned the role of principal on day-one and, by design, he never has served and never will serve 'in a subordinate capacity' to any other official" in the U.S. Attorney's Office. 442 F. Supp. 3d at 26.

DOJ made that design perfectly clear. The form purporting to designate Sarcone as First Assistant itself states that he is being designated for the purpose of "[s]erving as Acting U.S. Attorney for a 210-day period," citing the FVRA. A:2092. And, in his letter to the district court from the day of his designation, Sarcone proclaimed that he was "now serving as Acting United States Attorney for the Northern District of New York indefinitely." A:2086. Sarcone cannot be First Assistant when DOJ expressly stated that he would never occupy that role, and he never did. A:2092. "[L]abels—without *any* substance" cannot create a First Assistant "under any plausible reading of the statute." *L.M.-M.*, 442 F. Supp. 3d at 26.

### C. Sarcone's Lack of Lawful Authority Invalidates the Subpoenas and Requires His Disqualification

Because Sarcone lacked lawful authority, the district court correctly quashed the grand jury subpoenas he sought and disqualified him from the underlying investigations.

65

## 1. Rule 17 Authorizes a Court to Quash a Subpoena Obtained Without Lawful Authority

DOJ does not dispute that a "grand jury subpoena may be invalidated where the person who requested the subpoena lacks *any* authority to request the subpoenas from the grand jury." Opening Br. 58 n.20. Nor could it. As numerous courts have recognized, "the appropriate remedy" when a prosecutor acts without authority "is invalidation of the officer's *ultra vires* acts." *United States v. Trump*, 740 F. Supp. 3d 1245, 1303 (S.D. Fla. 2024). "All actions that flowed from [the] defective appointment" of the prosecutor are "unlawful exercises of executive power." *Id.*; *see also Comey*, 810 F. Supp. 3d at 774; *James*, 810 F. Supp. 3d at 765-66.[15]

Nor does DOJ contest that OAG could challenge Sarcone's authority to seek the subpoenas via Rule 17(c). Opening Br. 58 n.20. Rule 17(c) provides that a court may quash a subpoena if compliance would be

---

[15] In some cases, courts have declined to dismiss indictments in districts where an improperly appointed prosecutor was installed, but that is because the improperly appointed prosecutor played no role in bringing the indictments. *See Ramirez*, 807 F. Supp. 3d at 1108-09; *United States v. Giraud*, 795 F. Supp. 3d 560, 606 (D.N.J. 2025); *Ramirez-Martinez*, 2026 WL 113431, at *21. Here, where Sarcone bears sole responsibility for the subpoenas, the subpoenas must be invalidated.

66

"unreasonable or oppressive," Fed. R. Crim. P. 17(c)(2), which courts have interpreted to require a context-specific analysis, *United States v. R. Enters.*, 498 U.S. 292, 299-300 (1991). When subpoenas reflect an "abuse of the grand jury process," courts do not hesitate to quash them under Rule 17(c). *Simels*, 767 F.2d at 30; *see United States v. Calk*, 87 F.4th 164, 186 (2d Cir. 2023) ("[C]ourts may not ignore possible abuse of the grand jury process."). Requesting subpoenas without lawful authority is unquestionably an abuse of the grand jury process, and compliance with such subpoenas would be both unreasonable and oppressive. As the district court recognized, "[g]rand juries are 'not meant to be the private tool of a prosecutor,' much less one who is not lawfully appointed." SA:021 (quoting *Calk*, 87 F.4th at 186).

Because Sarcone had no lawful authority to seek these subpoenas—and, indeed, was not properly appointed to *any* position within DOJ at the time—the district court correctly quashed the subpoenas.

### 2. Sarcone's Improper Appointment Requires His Disqualification

Likewise, because Sarcone has no authority to investigate OAG, the district court correctly disqualified him from further participation.

As the Supreme Court has recognized, the "appropriate remedy" for

official action "tainted with an appointments violation" is to invalidate the action and require that a different, properly appointed official handle any further proceedings. *Lucia*, 585 U.S. at 251 & n.5 (quotations omitted); *see Flinton v. Comm'r of Soc. Sec.*, 143 F.4th 90, 91 (2d Cir. 2025).

In keeping with that general rule, numerous courts have disqualified improperly appointed Acting U.S. Attorneys from criminal proceedings they lacked authority to conduct. *See Giraud*, 160 F.4th at 407; *Giraud*, 795 F. Supp. 3d at 602; *Naviwala*, 2026 WL 658885, at *46; *Garcia*, 2025 WL 2784640, at *18.

That is hardly surprising. If a person who lacks power to prosecute could nonetheless press forward with a criminal proceeding, it "would mean the Government could send any private citizen off the street" to do its most serious work. *James*, 810 F. Supp. 3d at 767; *see Trump*, 603 U.S. at 643 (Thomas, J., concurring) ("A private citizen cannot criminally prosecute anyone."). The district court's well-reasoned order guards against such an absurd result.

## CONCLUSION

This Court should affirm.

68

DATED:  April 6, 2026            MUNGER, TOLLES & OLSON LLP

                                 By: /s/ Donald B. Verrilli, Jr.

BARBARA D. UNDERWOOD                 DONALD B. VERRILLI, JR.
  *Solicitor General*                MUNGER, TOLLES & OLSON LLP
KUMIKI GIBSON                        601 Massachusetts Avenue NW
MICHAEL JAFFE                          Suite 500E
OFFICE OF THE NEW YORK               Washington, DC 20001
STATE ATTORNEY GENERAL               Telephone: (202) 220-1100
28 Liberty Street
New York, NY 10005                   HAILYN J. CHEN
Telephone: (212) 416-8000            VICTORIA A. DEGTYAREVA
                                     MUNGER, TOLLES & OLSON LLP
                                     350 South Grand Avenue,
                                       50th Floor
                                     Los Angeles, CA 90071
                                     Telephone: (213) 683-9100


            *Counsel for Petitioner-Appellee*

69

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the word limitation in Local Rule 32.1(a)(4) because it contains 13,979 words.

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in New Century Schoolbook 14-point font.


 DATED:  April 6, 2026              By:   */s/ Donald B. Verrilli, Jr.*
                                          Donald B. Verrilli, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2026, I caused the foregoing to be filed electronically and served on all counsel of record through the Court's ACMS system.

DATED:  April 6, 2026                    By   */s/ Donald B. Verrilli, Jr.*
                                              Donald B. Verrilli, Jr.

71