# 26-156

## United States Court of Appeals for the Second Circuit

---

IN RE GRAND JURY SUBPOENAS TO THE OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL,

*Petitioner-Appellee,*

v.

UNITED STATES OF AMERICA

*Respondent-Appellant*

---

On Appeal from the United States District Court for the Northern District of New York, No. 1:25-mc-19 (Schofield, J. (S.D.N.Y.))

---

**BRIEF FOR AMICI CURIAE NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS AND NEW YORK STATE ASSOCIATION OF CRIMINAL DEFENSE LAWYERS IN SUPPORT OF APPELLEE AND AFFIRMANCE**

---

JOEL B. RUDIN
VICE CHAIR, AMICUS COMMITTEE
NATIONAL ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS
152 WEST 57TH ST., 8TH FLOOR
NEW YORK, NEW YORK 10019
212-752-7600

STEPHEN N. PREZIOSI
CHAIR, AMICUS COMMITTEE
N.Y. STATE ASSOCIATION OF
CRIMINAL DEFENSE LAWYERS
48 WALL STREET, ELEVENTH FLOOR
NEW YORK, NEW YORK 10005
212-960-8267

JAMES I. PEARCE
SAMANTHA P. BATEMAN
MARY L. DOHRMANN
WASHINGTON LITIGATION GROUP
1717 K ST NW, SUITE 1120
WASHINGTON, D.C. 20006
202-521-8750
jpearce@washingtonlitigationgroup.org

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae,* the National Association of Criminal Defense Lawyers and the New York State Association of Criminal Defense Lawyers, are not corporate entities and are not owned in whole or in part by any corporate entity.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ...................................................ii

TABLE OF AUTHORITIES ........................................................................ iiv

INTEREST OF THE *AMICUS CURIAE* ..........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT................................. 2

STATEMENT OF THE CASE ........................................................................4

     I.     Legal Background.........................................................................4

     II.    Factual Background................................................................... 5

ARGUMENT.................................................................................................. 7

     I.     United States Attorneys Exercise Extraordinary
            Authority and Discretion...........................................................8

     II.    The Power To Appoint U.S. Attorneys Has Never
            Been Solely Concentrated In The Executive Branch ................ 11

     III.   In Attempting to Exercise Unilateral U.S. Attorney
            Appointment Power, The Executive Branch Has
            Exceeded Congressional Limits................................................19

          A.    In This and Other Cases, the Executive Branch
                 Has Pursued Unilateral U.S. Attorney
                 Appointment Power. .......................................................19

          B.    Unilateral Executive Branch Control Over U.S.
                 Attorney Appointments Enables Prosecutorial
                 Abuses. ......................................................................... 27

CONCLUSION............................................................................................. 32

# TABLE OF AUTHORITIES

**CASES** **Page(s)**

*Berger v. United States,*
  295 U.S. 78 (1935) ...................................................................10

*Edmond v. United States,*
  520 U.S. 651 (1997)...................................................14, 15, 28

*Ewing v. Mytinger & Casselberry,*
  339 U.S. 594 (1950) ...................................................................9

*Freytag v. Comm'r,*
  501 U.S. 868 (1991)............................................................ 7, 14

*INS v. Chadha,*
  462 U.S. 919 (1983) ............................................................... 14

*Morrison v. Olson,*
  487 U.S. 654 (1988)..........................................................8, 27, 28

*NLRB v. SW Gen., Inc.,*
  580 U.S. 288 (2017)......................................................... passim

*NLRB. v. New Vista Nursing and Rehab.,*
  719 F.3d 203 (3d Cir. 2013) ...................................................22

*Trump v. United States,*
  603 U.S. 593 (2024) ...............................................................27

*United States v. Armstrong,*
  517 U.S. 456 (1996)................................................................. 8

*United States v. Arthrex, Inc.,*
  594 U.S. 1 (2021)................................................................... 15

*United States v. Baraka,*
  No. 25-mj-11131 (D.N.J.) (May 21, 2025) .............................29

*United States v. Batchelder,*
  442 U.S. 114 (1979) ................................................................. 8

*United States v. Comey,*
  810 F. Supp. 3d 768 (E.D. Va. 2025)..............................23, 24

*United States v. Fisher,*
  455 F.2d 1101 (2d Cir. 1972) ....................................................9

# TABLE OF AUTHORITIES—Continued

Page(s)

*United States v. Garcia,*
No. 25-cr-230, 2025 WL 2784640 (D. Nev. Sept. 30, 2025)................26

*United States v. Giraud,*
795 F.Supp.3d 560 (D.N.J. 2025), *aff'd,*
160 F.4th 390 (3d Cir. 2025) ........................................ passim

*United States v. Hilario,*
218 F.3d 19 (1st Cir. 2000) ................................................. 16

*United States v. James,*
810 F. Supp. 3d 752 (E.D. Va. 2025) ...................................23, 24, 29, 30

*United States v. Nixon,*
418 U.S. 683 (1974) ...........................................................27

*United States v. Ramirez,*
807 F.Supp.3d 1086 (C.D. Cal. 2025)....................................26

*United States v. Ramirez-Martinez,*
No.22-cr-1721, 2026 WL 113431 (D.N.M. Jan. 14, 2026) .......................26

*United States v. Samango,*
607 F.2d 877 (9th Cir. 1979)...............................................9

*United States v. Serubo,*
604 F.2d 807 (3d Cir. 1979)................................................. 8

**CONSTITUTION, RULES, STATUTES:**

U.S. Const. art. II, § 2, cl. 2........................................................4

5 U.S.C. § 3345 ................................................................ 5, 16

5 U.S.C. § 3345(a)(1) ........................................................ 5, 17

5 U.S.C. § 3345(a)(2) ........................................................ 17

5 U.S.C. § 3345(a)(3) ........................................................ 17

5 U.S.C. § 3346(a)(1) ........................................................ 17

5 U.S.C. § 3347 ................................................................ 20, 22

5 U.S.C. § 3348(b) ...........................................................18

# TABLE OF AUTHORITIES—Continued

Page(s)

28 U.S.C. § 515 ............................................................................. 6

28 U.S.C. § 541 .......................................................................... 15

28 U.S.C. § 541(a) ................................................................. 4, 28

28 U.S.C. § 546 ...................................................................... 4, 16

28 U.S.C. § 546(a) ................................................................. 5, 24

28 U.S.C. § 546(a) ........................................................................ 4

28 U.S.C. § 546(b) ....................................................................... 4

28 U.S.C. § 546(c) .................................................................. 4, 16

28 U.S.C. § 547 ............................................................................ 8

Act of Feb. 20, 1863, ch. 45, 12 Stat. 656 ................................ 15

Act of July 23, 1868, ch. 227, 15 Stat. 168 .............................. 15

Act of March 3, 1863, ch. 93, § 2, 12 Stat. 768 ....................... 16

Act of Sept. 6, 1966, Pub. L. No. 89-554, § 541(c), 80 Stat. 617 .......... 14, 16

Judiciary Act, ch. 20, 1 Stat. 73 (1789) ................................... 12

Preserving United States Attorney Independence Act of 2007, Pub. L. No. 110-34, § 2, 121 Stat. 224 .............................................. 18

USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, Title V, § 502, 120 Stat. 192 (2006) ................................. 18

## MISCELLANEOUS GOVERNMENT DOCUMENTS:

H.R. Rep. No. 110-58 (2007) ............................................... 16, 18

*In re: Publishing a Vacancy Announcement for an Interim United States Attorney Pursuant to 28 U.S.C. § 546(d)* (E.D. Va., Jan. 20, 2026) ....................... 25

Letter from George Washington, U.S. President, to the U.S. Senate (Sept. 24, 1789) ................................... 13

Letter from John Adams, U.S. President, to the U.S. Senate (July 7, 1797) ......................................... 13

# TABLE OF AUTHORITIES—Continued

Page(s)

Letter from Thomas Jefferson, U.S. President,
   to the U.S. Senate (Jan. 28, 1805) ..................................................... 13

*Removing Politics from the Administration of*
   *Justice: Hearings on S. 2803 and S. 2978 Before*
   *the S. Comm. on the Judiciary*, 93rd Cong. 16 (1974) ...........................10

Robert H. Jackson, U.S. Att'y Gen., Address Delivered at the Second
   Annual Conference of United States Attorneys:
   The Federal Prosecutor 1 (Apr. 1, 1940)................................... 3, 9, 10, 11

S. Exec. Journal, 1st Cong., 1st Sess. 29-32 (1789)                   13

S. Rep. No. 105-250 (1998) ...................................................................... 17

Temporary Filling of Vacancies in the Office of
   United States Attorney, 27 Op. O.L.C. 149 (2003) ............................... 17

The Federalist No. 76
   (Alexander Hamilton) (Cooke ed. 1961) .........................................14, 15

*Appointment of Interim United States Attorney by*
   *the United States District Court for the Eastern*
   *District of Virginia, Pursuant to Title 28, United States*
   *Code, Section 546(d), United States District Court for*
   *the Eastern District of Virginia (Feb. 20, 2026)*...................................25

*Re: United States Attorney for the Northern District*
   *of New York*, United States District Court for the
   Northern District of New York (Feb. 12, 2026) ................................... 21

## OTHER PUBLICATIONS:

Andrew Kent, *Congress and the Independence of Federal Law*
   *Enforcement*, 52 U.C. Davis L. Rev. 1927 (2019) .................................10

Charles Warren, *New Light on the History of the Federal*
   *Judiciary Act of 1789*, 37 Harv. L. Rev. 49 (1923) ................................. 12

Human Events Daily with Jack Posobiec,
   Newly Appointed New Jersey DA Alina Habba
   Live From the White House, Human Events (Mar. 27, 2025)...............29

James A. Heilpern, *Interim United States Attorneys*,

# TABLE OF AUTHORITIES—Continued

Page(s)

28 Geo. Mason L. Rev. 187 (2020) ...................................................... 13

Jennifer L. Selin & Lauren Mattioli, *Independent Justice?
U.S. Attorneys As A Case Study of Political Appointments*,
58 U. Mich. J.L. Reform 675 (2025) ...................................................... 12

Jeremy Herb et al., *Inside the Seven Tumultuous Days
That Led to the James Comey Indictment*,
CNN (updated Sept. 28, 2025) ........................................................... 29

Jonah Bromwich, *U.S. Attorney Chosen to Replace Trump
Pick Is Quickly Fired By White House*,
New York Times (Feb. 11, 2026) ........................................................... 21

Joseph Story, *Commentaries on the Constitution
of the United States* (1833) ................................................................... 28

Kyla Guilfoil et al., *DOJ Fires New U.S. Attorney Hours
After Judges Appointed Him to Replace Trump Loyalist*,
NBC News (updated Feb. 21, 2026) ....................................................... 25

Melissa Quinn, *Trump's Attacks on Comey and Leadership
Shifts in Prosecutors' Office Could Undermine Case,
Legal Experts Say*, CBS NEWS (updated Oct. 8, 2025) ....................... 30

Sara Sun Beale, *Rethinking the Identity and Role of
United States Attorneys*, 6 Ohio St. J. Crim. L. 369 (2009) ................. 13

Scott Ingram, *Representing the United States Government:
Reconceiving the Federal Prosecutor's Role Through A
Historical Lens*, 31 Notre Dame J.L. Ethics
& Pub. Pol'y 293 (2017) ....................................................................... 13

Scott MacFarlane, *Trump Admin. Fires 2 Prosecutors Who
Opposed Charges Against N.Y. Attorney General
Letitia James, Source Says*, CBS NEWS (Oct. 20, 2025) ..................... 30

Taylor Robinson, *A Timeline of the Conflict Between Letitia
James and Donald Trump*, N.Y. TIMES (Oct. 9, 2025), ....................... 2

## INTEREST OF THE *AMICUS CURIAE*[1]

*Amici Curiae* are the National Association of Criminal Defense Lawyers (NACDL) and the New York State Association of Criminal Defense Lawyers (NYSACDL). *Amici* are voluntary professional bar associations that work to ensure justice and due process for those accused of crime or misconduct. NACDL has thousands of members nationwide and up to 40,000 attorneys in affiliate organizations. NYSACDL is a state affiliate of NACDL and includes over 1,900 attorneys, including private practitioners, public defenders, and law professors, and is the largest private criminal bar in New York. *Amici* are dedicated to the fair administration of justice, and both file *amicus* briefs each year in federal and state courts in cases presenting issues important to criminal defendants, criminal defense lawyers, and the criminal justice system as a whole.

---

[1] No counsel for any party has authored any part of this brief, and no entity or person, aside from *amicus curiae* and its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. All parties consent to the filing of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

New York State Attorney General Letitia James has been the subject of years of public attacks by President Donald Trump, based both on her speech while campaigning for the office of New York's Attorney General, and on the civil investigations and lawsuits that the State of New York brought against the President and his family business while she was serving in that role.[2]  The President has repeatedly called for her investigation and prosecution.

After his supposed appointment as the acting U.S. Attorney for the Northern District of New York in July 2025, John Sarcone wasted little time before he followed through on the President's directive.  On August 5, 2025, he personally issued two grand jury subpoenas to New York in matters directly related to Ms. James's actions as Attorney General.

But those subpoenas suffered an identical and fatal defect: the order appointing Mr. Sarcone was unlawful.  As the State of New York explains in its brief, Mr. Sarcone was not eligible to serve as the temporary U.S. Attorney either under the Federal Vacancies Reform Act or by means of authority delegated from the Attorney General.

---

[2] *See, e.g.*, Taylor Robinson, *A Timeline of the Conflict Between Letitia James and Donald Trump*, N.Y. TIMES (Oct. 9, 2025), https://www.nytimes.com/2025/10/09/us/politics/letitia-james-trump-conflict-timeline.html.

The legal issue presented by Mr. Sarcone's unlawful appointment is no technical matter, and the stakes extend far beyond this case. The U.S. Attorney for each federal district wields vast powers—either as "one of the most beneficent forces in our society" or, when acting "from malice or other base motives," "one of the worst." Robert H. Jackson, U.S. Att'y Gen., Address Delivered at the Second Annual Conference of United States Attorneys: The Federal Prosecutor 1 (Apr. 1, 1940). Since Congress first created U.S. Attorneys in 1789, Presidents have understood that anyone nominated to fill such a position must obtain the Senate's advice and consent. And from the 1860s until the 1980s, Congress provided that the Judiciary—not the Executive—may select a temporary U.S. Attorney when the post is vacant. The Executive's authority to unilaterally appoint a U.S. Attorney is recent, narrow, and limited.

In attempting to appoint Mr. Sarcone (and others throughout the country), the Executive abused that power. This case—where an unlawful appointee wielded the power of the grand jury against the President's perceived political adversary—demonstrates how such abuses beget further abuses. This Court should enforce the statutes Congress passed with respect to the awesome position of U.S. Attorney and affirm the district court's order quashing the subpoenas.

3

## STATEMENT OF THE CASE

### I.    LEGAL BACKGROUND

The Appointments Clause provides that "Officers of the United States" shall be appointed by the President with the advice and consent of the Senate. U.S. Const. art. II, § 2, cl. 2. But "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id*. U.S. Attorneys are inferior officers whom Congress has directed must be appointed by the President, with the advice and consent of the Senate. 28 U.S.C. § 541(a).

To address vacancies in a U.S. Attorney position, Congress enacted 28 U.S.C. § 546. Under Section 546, the Attorney General may appoint an interim U.S. Attorney, *id*. § 546(a), so long as the Attorney General's appointee is not a person that the President nominated to the same office and to whom "the Senate refused to give advice and consent." *Id*. § 546(b). An interim U.S. Attorney under Section 546(a) serves until either the "qualification" of a presidentially appointed and Senate-confirmed nominee or for 120 days. *Id*. § 546(c). If the 120 days expires, the district court in the relevant judicial district "may appoint" a U.S. Attorney "to serve until the vacancy is filled." *Id*. § 546(d).

4

Congress has also long supplied the President with "limited authority to appoint acting officials" "temporarily" "without first obtaining Senate approval" to an office that otherwise requires presidential appointment and Senate confirmation ("PAS"). *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 294 (2017). The current law, enacted in 1998, is the Federal Vacancies Reform Act, 5 U.S.C. §§ 3345 *et seq.* ("FVRA"), which identifies three types of government officials who may perform acting service in a PAS office. *Id.* § 3345(a)(1)-(3). The FVRA provides, as a default, that the "first assistant" serves as the acting officer, but allows the President (but only the President) to instead select another Senate-confirmed officer or a sufficiently senior officer or employee in the agency. *Id.* § 3345(a)(1)-(3).

## II.    FACTUAL BACKGROUND[3]

After the last Senate-confirmed U.S. Attorney for the Northern District of New York resigned on February 17, 2025, the then-First Assistant U.S. Attorney became the acting U.S. Attorney under the FVRA. On February 28, the Attorney General appointed John Sarcone to serve as the interim U.S. Attorney under 28 U.S.C. § 546(a), stating in the appointment order that his term would begin on March 17.

---

[3] The facts in this section are drawn from the district court's recitation. *See* ECF No. 50 at 3-7.

On July 14, 2025, when the 120-day limit in Section 546(c) would have expired, the federal government took several steps designed to keep Mr. Sarcone as the top prosecutor in the district. Mr. Sarcone sent a letter to the Chief Judge of the Northern District of New York in which he claimed that (1) he had been appointed as a "Special Attorney" under 28 U.S.C. § 515; (2) he had been designated as the First Assistant U.S. Attorney; and (3) under the FVRA, he was then serving as the acting U.S. Attorney in the district. On the same day, the Department of Justice approved a request for Mr. Sarcone to serve as First Assistant U.S. Attorney for one year and reassigned the individual who had been holding that position back to a line prosecutor.

Less than a month later, on August 5, 2025, the New York State Attorney General's Office received two federal grand jury subpoenas signed only by Mr. Sarcone as the "Acting United States Attorney" for the Northern District of New York. One subpoena sought documents and records related to a civil case that New York pursued against President Trump for financial fraud. The other subpoena concerned a civil action that New York brought against the National Rifle Association. Unusually, the cover letters for both subpoenas directed the State Government to provide materials responsive to the subpoenas to Mr. Sarcone personally.

6

New York moved to quash the subpoenas. On January 8, 2026, the district court granted the motion on the ground that Mr. Sarcone was not validly serving as the acting U.S. Attorney when the subpoenas issued.

## ARGUMENT

"[T]he power of appointment to offices was deemed the most insidious and powerful weapon of eighteenth century despotism." *Freytag v. Comm'r*, 501 U.S. 868, 883 (1991) (citation omitted). The Framers thus crafted the Appointments Clause to empower Congress to define the duties of officers; provide the Senate the critical role in confirming the appointment of all principal officers; and allow Congress to vest the appointment of inferior officers in the President, the heads of departments, or the Courts.

Cognizant of the far-reaching prosecutorial powers that U.S. Attorneys wield, Congress has long both required Senate approval for U.S. Attorney appointments and restricted who may serve during a vacancy. But in this case and elsewhere throughout the country, the Executive Branch has run roughshod over those rules, seeking unilateral control over U.S. Attorney appointments. If permitted, that approach would fatally undermine the system Congress carefully calibrated to ensure that only qualified and worthy candidates wield the formidable powers of a U.S. Attorney. It would also

7

enable the Executive Branch, as in this case, to use prosecutorial powers as a weapon to target individuals the Executive deems political adversaries.

## I. UNITED STATES ATTORNEYS EXERCISE EXTRAORDINARY AUTHORITY AND DISCRETION

United States Attorneys exercise the "vast power" and "immense discretion" of a prosecutor at the highest level. *Morrison v. Olson*, 487 U.S. 654, 727 (1988) (Scalia, J., dissenting). They decide how "to enforce the Nation's criminal laws," and courts afford "the presumption of regularity" to their "prosecutorial decisions." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quotation marks omitted); *see also* 28 U.S.C. § 547 (setting out the duties of U.S. Attorneys).

To be sure, the defense bar and the courts play a critical role in protecting against prosecutorial abuse once a case has been filed. But "[w]hether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion" alone. *United States v. Batchelder*, 442 U.S. 114, 124 (1979). Indeed, "grand jury proceedings are secret, Ex parte[,] and largely under the control of the federal prosecutor." *United States v. Serubo*, 604 F.2d 807, 816 (3d Cir. 1979) (footnote omitted). In that setting, "the prosecutor operates without the check of a judge or a trained legal adversary, and [is] virtually immune from public scrutiny." *Id.* at 817. As this Court has explained, however, the grand

jury can perform its independent investigatory function only when it does not become "the private tool of a prosecutor." *United States v. Fisher*, 455 F.2d 1101, 1105 (2d Cir. 1972); *see United States v. Samango*, 607 F.2d 877, 882 (9th Cir. 1979) (the grand jury's dual role—"independent determination of probable cause that a crime has been committed and protection of citizens against unfounded prosecutions"—requires freedom from "manipulation . . . by over-zealous prosecutors"). For offenses that are not subject to the Fifth Amendment's Grand Jury Clause, a prosecutor may charge a person by information alone. *See Ewing v. Mytinger & Casselberry*, 339 U.S. 594, 599 (1950) (noting the "impact" of an "indictment" or "information" "on the reputation or liberty of a man" and the "incalculable" "harm" caused "by the mere institution of [a] proceeding[]").

In an address to U.S. Attorneys more than 80 years ago, then-Attorney General Robert Jackson observed that prosecutors have "more control over life, liberty, and reputation than any other person in America." Robert H. Jackson, U.S. Att'y Gen., Address Delivered at the Second Annual Conference of United States Attorneys: The Federal Prosecutor 1 (Apr. 1, 1940). That control comes with attendant responsibilities to exercise power in a scrupulously fair and ethical manner. Indeed, federal prosecutors operate not as "an ordinary party to a controversy," but instead as a

9

"representative" of "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all." *Berger v. United States*, 295 U.S. 78, 88 (1935). In that role, prosecutors seek not merely to "win a case"; their efforts, including prosecuting "with earnestness and vigor," and "strik[ing] hard blows" but not "foul ones," aim foremost to ensure that "justice shall be done." *Id.*; *accord* Jackson, *supra*, at 3 ("Although the government technically loses its case, it has really won if justice has been done.").

Seeking justice requires that prosecutions be based on "law and merit, and not on considerations of party affiliation, political image-making, or White House approval or influence." *Removing Politics from the Administration of Justice: Hearings on S. 2803 and S. 2978 Before the S. Comm. on the Judiciary*, 93rd Cong. 16 (1974) (statement of Hon. Theodore C. Sorenson, Former Special Counsel to President Kennedy); *see* Andrew Kent, *Congress and the Independence of Federal Law Enforcement*, 52 U.C. Davis L. Rev. 1927, 1934 (2019) ("Partisan political considerations, personal vendettas or favoritism, financial gain, or self-protection or self-dealing should play no role in investigating or prosecuting cases, hiring or firing career officials, prosecutors, and law enforcement agents, and U.S. Attorneys and FBI Directors."). Thus, prosecutors, when assessing whether to open an

10

investigation or pursue criminal charges, must maintain "a detached and impartial view of all groups in [their] community." Jackson, *supra*, at 4.

Jackson recognized, however, that the "tremendous" power and discretion that prosecutors wield could, in the wrong hands, lead to abuses. *Id.* at 1. "He can have citizens investigated and, if he is that kind of person, he can have this done to the tune of public statements and veiled or unveiled intimation." *Id.* Those abuses might culminate in "the most dangerous power of the prosecutor: that he will pick people that he thinks he should get, rather than pick cases that need to be prosecuted." *Id.* at 4. That concern was greatest, Jackson worried, "[i]n times of fear or hysteria," where a person may be targeted for "being unpopular with the predominant or governing group, being attached to the wrong political views, or being personally obnoxious to or in the way of the prosecutor himself." *Id.* at 5.

## II. THE POWER TO APPOINT U.S. ATTORNEYS HAS NEVER BEEN SOLELY CONCENTRATED IN THE EXECUTIVE BRANCH

Jackson also recognized that because U.S. Attorneys possess "immense power to strike at citizens . . . with all the force of government itself," the U.S. Attorney position "*from the very beginning* has been safeguarded by presidential appointment, requiring confirmation of the Senate." *Id.* at 2 (emphasis added). Meanwhile, Congress relied on the Judiciary to fill

temporary U.S. Attorney vacancies for more than 150 years, giving little or no role to the Executive Branch. That long history demonstrates that all three branches have shared the power and responsibility for appointing U.S. Attorneys.

**A.** Congress originally established the U.S. Attorney position as the "attorney for the United States in [ea]ch district" shortly after the Founding in the 1789 Judiciary Act. *See* Judiciary Act, ch. 20, § 35, 1 Stat. 73, 92-93 (1789). The Judiciary Act's original version envisioned that the pertinent district court—also newly created under the Act, *id.* § 3—would appoint "a meet person learned in the law, to act as Attorney of the United States in each district." Charles Warren, *New Light on the History of the Federal Judiciary Act of 1789*, 37 Harv. L. Rev. 49, 108 (1923) (quotation marks omitted); *see* Jennifer L. Selin & Lauren Mattioli, *Independent Justice? U.S. Attorneys As A Case Study of Political Appointments*, 58 U. Mich. J.L. Reform 675, 684 (2025) (noting that the Act's name and legislative history "gave the impression that U.S. Attorneys were connected to the federal judiciary"). As enacted, the Act was silent on where the appointment power rested, *see* Judiciary Act, § 35 ("there shall be appointed"), but President George Washington appointed several U.S. Attorneys "[w]ithin days of the Judiciary Act becoming law." Scott Ingram, *Representing the United States*

*Government: Reconceiving the Federal Prosecutor's Role Through A Historical Lens*, 31 Notre Dame J.L. Ethics & Pub. Pol'y 293, 301 (2017).

Although the Judiciary Act did not expressly require it, Presidents consistently understood the law to require the Senate's advice and consent for U.S. Attorney appointments. For example, in September 1789, President Washington sent to the Senate a slate of nominees that included 11 new U.S. Attorney appointments, Letter from George Washington, U.S. President, to the U.S. Senate (Sept. 24, 1789), https://perma.cc/E9BP-KR86 (appointing original U.S. Attorneys), and the Senate promptly confirmed them, S. Exec. Journal, 1st Cong., 1st Sess. 29-32 (1789). His successors followed suit. *See, e.g.*, Letter from John Adams, U.S. President, to the U.S. Senate (July 7, 1797), https://perma.cc/837V-C3BV (nominating Jeremiah Smith to be U.S. Attorney for the District of New Hampshire); Letter from Thomas Jefferson, U.S. President, to the U.S. Senate (Jan. 28, 1805), https://perma.cc/RB2K-NRJS (nominating Edward Scott to be the U.S. Attorney for the district of "East Tenissee"). The Executive Branch thus did not interpret the Judiciary Act as granting it "unilateral authority to appoint" U.S. Attorneys. James A. Heilpern, *Interim United States Attorneys*, 28 Geo. Mason L. Rev. 187, 190 (2020); *see* Sara Sun Beale, *Rethinking the Identity and Role of United States Attorneys*, 6 Ohio St. J. Crim. L. 369, 392 (2009) ("Like the attorney

13

general, the new federal attorneys and marshals in each district were appointed by the president with the advice and consent of the Senate.").

The Executive Branch's historical understanding that U.S. Attorney nominees must secure the Senate's confirmation—an understanding that Congress made explicit in 1966, *see* Act of Sept. 6, 1966, Pub. L. No. 89-554, § 541(c), 80 Stat. 617, 617—"serves both to curb Executive abuses of the appointment power" and "to promote a judicious choice of persons" to fill the position. *Edmond v. United States*, 520 U.S. 651, 659-60 (1997) (citations omitted; cleaned up). Acutely conscious that the "manipulation of official appointments" was a "powerful weapon" in the Crown's hands, *Freytag*, 501 U.S. at 883 (citation omitted), the Framers provided Congress, not the Executive Branch, the role of defining offices and appointment methods. Having "'lived under a form of government that permitted arbitrary governmental acts to go unchecked,'" the Framers "recognized the serious risk for abuse and corruption posed by permitting one person to fill every office in the Government." *SW Gen.*, 580 U.S. at 317 (Thomas, J., concurring) (first quoting *INS v. Chadha*, 462 U.S. 919, 959 (1983); and then citing The Federalist No. 76, at 513 (Alexander Hamilton) (Jacob E. Cooke ed., 1961)).

14

Subjecting the President's nominations to Senate scrutiny provides "an excellent check upon the spirit of favoritism in the President" and "tend[s] to prevent the appointment of unfit characters."  The Federalist No. 76, at 513.  Congress has thus made "nomination by the President and confirmation by the Senate"—the "'default manner of appointment' for inferior officers," *United States v. Arthrex, Inc.*, 594 U.S. 1, 12 (2021) (citing *Edmond*, 520 U.S. at 660)—statutorily required for U.S. Attorneys, 28 U.S.C. § 541.

**B.**  Prompt presidential nomination and Senate consideration is not always feasible, particularly where a U.S. Attorney leaves office unexpectedly.  Congress has therefore provided for the temporary filling of the U.S. Attorney office, historically assigning the Judiciary a leading role, and limiting the Executive Branch's ability to make unilateral appointments even on a temporary basis.

Beginning in the 1860s, Congress provided the power to make temporary U.S. Attorney appointments.  In the midst and aftermath of the Civil War, Congress passed or updated several statutes to ensure continuity in Executive Branch positions.  *See, e.g.*, Act of Feb. 20, 1863, ch. 45, 12 Stat. 656; Act of July 23, 1868, ch. 227, 15 Stat. 168; *see also SW Gen.*, 580 U.S. at 294 (discussing this history).  One such law addressed a vacancy in the U.S. Attorney position.  That law empowered the *Judiciary*—not the Executive

15

Branch—to make an interim U.S. Attorney appointment. *See* Act of March 3, 1863, ch. 93, § 2, 12 Stat. 768, 768. When Congress first enacted 28 U.S.C. § 546 in 1966, it confirmed that "[t]he district court for the district in which the office of United States attorney is vacant" held the authority to "appoint a United States attorney to serve until the vacancy is filled." 80 Stat. at 618.

It was not until Congress amended Section 546 in 1986 that Congress empowered the Executive Branch, through the Attorney General, to unilaterally appoint a temporary U.S. Attorney. *See* H.R. Rep. No. 110-58, at 4 (2007). That unilateral appointment authority could (and can) last no longer than 120 days, after which the district court is authorized to appoint the interim U.S. Attorney. *See* 28 U.S.C. § 546(c), (d). Unlike an interim U.S. Attorney appointed by the Attorney General, a judicially appointed U.S. Attorney is not subject to any statutory time limit. *See United States v. Hilario*, 218 F.3d 19, 23 (1st Cir. 2000) (holding that a judicially appointed interim U.S. Attorney had lawfully served for over six years).

Similarly limiting the Executive Branch's role in appointing temporary U.S. Attorneys is the Federal Vacancies Reform Act, 5 U.S.C. §§ 3345 *et seq.* ("FVRA"), which applies across the Executive Branch, and on which the Executive Branch has relied to fill vacant U.S. Attorney's offices. *See* Temporary Filling of Vacancies in the Office of United States Attorney, 27

16

Op. O.L.C. 149, 149-51 (2003) (opining that both Section 546 and the FVRA are available for U.S. Attorney vacancies).  The FVRA's limitations take two forms.  First, it restricts who may serve in a vacant Executive Branch office.  Under the statute's default rule in 5 U.S.C. § 3345(a)(1), the office's "first assistant shall perform acting duties," *SW Gen.*, 580 U.S. at 301, a provision that leaves "no role" for the President, *United States v. Giraud*, 795 F.Supp.3d 560, 589 (D.N.J. 2025), *aff'd*, 160 F.4th 390 (3d Cir. 2025).  The President (and only the President) can deviate from that default rule, but only in two narrow ways: by selecting someone (1) who has already received the Senate's advice and consent, 5 U.S.C. § 3345(a)(2), or (2) who has held a senior position in the agency for at least 90 days, *Id.* § 3345(a)(3), and can thus perform "the routine functions of the office."  S. Rep. No. 105-250, at 12 (1998).

Second, the FVRA allows the acting officer to serve only for "a limited period of time." *Id.*  As a general matter, an acting officer may serve no longer than 210 days from the vacancy's occurrence.  5 U.S.C. § 3346(a)(1).  Although that time may be extended under certain circumstances, *see, e.g. id.* § 3345(a)(2), (b), the FVRA likewise provides that if the Executive Branch fails to comply with the statute's time limitations (or other provisions), the office "remain[s] vacant," with its functions and duties to be performed only

17

by the agency head, *id.* § 3348(b).  In short, the FVRA supplies the President with only "limited authority to appoint acting officials to temporarily" fill a vacant office—including the U.S. Attorney—"without first obtaining Senate approval." *SW Gen.*, 580 U.S. at 294.

Nearly 20 years ago, Congress reaffirmed the Executive Branch's limited role in filling U.S. Attorney positions on a temporary basis.  In 2006, Congress abolished the 120-day limit under Section 546(c) for an Attorney-General-selected interim U.S. Attorney.  USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, Title V, § 502, 120 Stat. 192, 246 (2006); *see* H.R. Rep. No. 110-58, at 5 (2007) (noting that the 2006 amendment permitted interim U.S. Attorneys appointed by the Attorney General to "serve indefinitely without Senate confirmation").  But when controversy ensued, Congress swiftly reinstated the 120-day limit, *see* Preserving United States Attorney Independence Act of 2007, Pub. L. No. 110-34, § 2, 121 Stat. 224, thereby reinvigorating the Judiciary's "backstopping role" in the appointment of interim U.S. Attorneys under Section 546(d), *Giraud*, 795 F.Supp.3d at 581.  That statutory change illustrated what the broader history amply confirms: the power to fill the U.S. Attorney position is shared, and the Executive Branch may not unilaterally

18

fill that office other than temporarily and for a brief interval, in accordance with carefully circumscribed statutory limits.

### III. IN ATTEMPTING TO EXERCISE UNILATERAL U.S. ATTORNEY APPOINTMENT POWER, THE EXECUTIVE BRANCH HAS EXCEEDED CONGRESSIONAL LIMITS

Despite the long history demonstrating that all three branches have shared authority to appoint who wields the tremendous power and discretion as the U.S. Attorney in each district, the Executive Branch in this case sought unilateral appointment power. This case is not an outlier: the Executive Branch has recently pursued similar tactics throughout the country. These actions, in this case and elsewhere, are precisely the type of Executive-Branch aggrandizement the Appointments Clause was designed to prevent. That is particularly so given the prosecutorial abuses that have ensued following the Executive's exercise of unilateral U.S. Attorney appointment power.

#### A. In This and Other Cases, the Executive Branch Has Pursued Unilateral U.S. Attorney Appointment Power.

The government's approach here and across the country aims to thwart other branches from participating in U.S. Attorney appointments. That approach violates the relevant statutes and threatens to erode critical structural safeguards by consolidating appointment and supervision authority within a single branch.

19

1. Start with this case. The government's claim that Mr. Sarcone was validly serving as the acting U.S. Attorney at the time the subpoenas in dispute here issued is inconsistent with the FVRA's text, structure, and history. *See* Appellee.Br.21-41. The government's alternative argument that the Attorney General could delegate to Mr. Sarcone's the full powers of the U.S. Attorney—including the power to issue grand jury subpoenas—squarely conflicts with the FVRA's exclusivity provision, 5 U.S.C. § 3347, and a contrary reading would eviscerate that statute's central purpose. *See id.* at 41-53. Here, those unlawful efforts are particularly troubling: the Executive sought to use the invalidly appointed U.S. Attorney "to subject political adversaries to criminal investigations." ECF No. 50, at 2.

Nor did the government's attempt to seize unilateral appointment control in the Northern District of New York cease with the installation of Mr. Sarcone. When the District Court for Northern District of New York subsequently exercised its authority under Section 546(d) to appoint Donald Kinsella as the interim U.S. Attorney on February 11, 2026, the Executive Branch removed that judicially appointed interim U.S. Attorney "[b]y the end of the day."[4] The Deputy Attorney General then announced in a social

---

[4] *Re: United States Attorney for the Northern District of New York*, United States District Court for the Northern District of New York (Feb. 12, 2026),

media post, "Judges don't pick U.S. Attorneys, @POTUS does . . . . See Article II of our Constitution.  You are fired, Donald Kinsella."[5]

2.  The government's efforts to seize unilateral control over the U.S. Attorney appointment process in the Northern District of New York form part of a larger and troubling pattern throughout the country.

- Underline District of New Jersey

In the District of New Jersey, the Attorney General appointed Alina Habba as the interim U.S. Attorney under Section 546(a) and the President nominated her for the permanent position.  *Giraud*, 160 F.4th at 395.  As the 120-day deadline under Section 546(c) neared, the district court announced that it would appoint under Section 546(d) the then-First Assistant U.S. Attorney to replace Habba.  In response, the Executive Branch took several convoluted steps: it purported to (1) make Ms. Habba a "Special Attorney" under Section 515; (2) remove the First Assistant as interim U.S. Attorney and terminate her employment with the Department of Justice; (3) designate Ms. Habba as the First Assistant; (4) withdraw Ms. Habba's nomination to

---

https://www.nynd.uscourts.gov/news/re-united-states-attorney-northern-district-new-york.

[5] Jonah Bromwich, *U.S. Attorney Chosen to Replace Trump Pick Is Quickly Fired By White House*, New York Times (Feb. 11, 2026), https://www.nytimes.com/2026/02/11/nyregion/donald-kinsella-ndny-sarcone-trump.html.

the permanent U.S. Attorney position; and then (5) assert that Ms. Habba was the acting U.S. Attorney under the FVRA. *Id.* at 395-96. The government later also argued that even if Ms. Habba was not lawfully serving as the acting U.S. Attorney under the FVRA, she could operate with authority delegated from the Attorney General. *Id.* at 402-03.

The Executive Branch's attempt to shoehorn Ms. Habba into the U.S. Attorney role thus bypassed not only the Senate's role envisioned in Section 541, but also the additional safeguard through the Judiciary that Congress provided in Section 546(d). On the government's delegation theory, Ms. Habba could have remained the *de facto* U.S. Attorney permanently. Permitting such conduct would have "eviscerate[d] the divided-powers framework" that the Appointments Clause "establish[es]." *NLRB. v. New Vista Nursing and Rehab.*, 719 F.3d 203, 230 (3d Cir. 2013).

The Third Circuit rightly rejected the Executive Branch's efforts at circumvention. It held that Ms. Habba was ineligible to serve as the acting U.S. Attorney under the FVRA because she was not serving as the First Assistant at the time the vacancy arose. *Giraud*, 160 F.4th at 397-401.[6] It also concluded that the government's delegation argument ran headlong into an exclusivity provision in the FVRA, 5 U.S.C. § 3347, which prohibits using

---

[6] This same reasoning applies equally to Mr. Sarcone.

22

the type of general vesting-and-delegation statutes on which the Attorney General claimed to rely. *Id.* at 402-06. The Third Circuit observed that the government's delegation theory—the same theory advanced by Mr. Sarcone—"would create a means for the Department of Justice to circumvent the FVRA's exclusivity provision, effectively permitting anyone to fill the U.S. Attorney role indefinitely," a result that "should raise a red flag, given the careful time limitations included in both the FVRA and the U.S. Attorney-specific statute." *Id.* at 406.

- Eastern District of Virginia

In the Eastern District of Virginia, Attorney General Pam Bondi appointed Erik Siebert as the interim U.S. Attorney under Section 546(a), and, after his 120-day term ended, Mr. Siebert was judicially appointed under Section 546(d). But months after that judicial appointment, Mr. Siebert resigned, reportedly following pressure from senior Department of Justice officials after he declined to pursue criminal charges against former FBI Director James Comey and New York State Attorney General Letitia James. *See United States v. James*, 810 F. Supp. 3d 752, 756 (E.D. Va. 2025); *United States v. Comey*, 810 F. Supp. 3d 768, 773 (E.D. Va. 2025). The Attorney General then purported to appoint Lindsey Halligan—who had previously served as the President's personal attorney—as the interim United

States Attorney for the Eastern District of Virginia under 28 U.S.C. § 546(a), and indictments of Mr. Comey and Ms. James swiftly followed. *See James*, 810 F. Supp. 3d at 756; *Comey*, 810 F. Supp. 3d at 773-74.

The district court dismissed the indictments in both cases, however, on the ground that Ms. Halligan was invalidly appointed as the interim U.S. Attorney. The court rejected the government's claim that Section 546 permits the Attorney General to make multiple interim U.S. Attorney appointments—that is, to appoint Ms. Halligan on an interim basis after Mr. Siebert had already completed a full 120-day term in that position—as inconsistent with that provision's text, structure, and history. *James*, 810 F. Supp. 3d at 758-63; *Comey*, 810 F. Supp. 3d at 776-80. If accepted, the district court observed, the government's position would permit the Executive Branch "to evade the Senate confirmation process indefinitely by stacking successive 120-day appointments." *James*, 810 F. Supp. 3d at 761; *Comey*, 810 F. Supp. 3d at 778.

Although Ms. Halligan no longer serves as the interim U.S. Attorney in the Eastern District of Virginia, the Executive Branch continues to assert—as it has in the Northern District of New York—that it alone may decide who serves as the U.S. Attorney there. On January 20, 2026, the Chief Judge of that District issued an order noting that Ms. Halligan's term as interim U.S.

24

Attorney expired and soliciting applications for the position under Section 546(d).  Order, *In re: Publishing a Vacancy Announcement for an Interim United States Attorney Pursuant to 28 U.S.C. § 546(d)*, at 1 (E.D. Va., Jan. 20, 2026).  On February 20, 2026, the district court appointed James W. Hundley to serve in that role, but, as the district court observed, the Executive Branch removed Mr. Hundley "[h]ours later."[7]  In a social media post shortly thereafter, the Deputy Attorney General wrote "Here we go again.  EDVA judges do not pick our US Attorney.  POTUS does.  James Hundley, you're fired!"[8]

- Other Federal Districts

In at least three other federal districts, courts have applied similar reasoning to conclude that the Executive Branch has unlawfully circumvented the laws governing U.S. Attorney appointments.  For example, in the District of Nevada, Sigal Chattah served for 119 days as the Attorney

---

[7] *Appointment of Interim United States Attorney by the United States District Court for the Eastern District of Virginia, Pursuant to Title 28, United States Code, Section 546(d)*, United States District Court for the Eastern District of Virginia (Feb. 20, 2026), https://www.vaed.uscourts.gov/news/appointment-interim-united-states-attorney-united-states-district-court-eastern-district.

[8] Kyla Guilfoil et al., *DOJ Fires New U.S. Attorney Hours After Judges Appointed Him to Replace Trump Loyalist*, NBC News (updated Feb. 21, 2026), https://www.nbcnews.com/politics/trump-administration/deputy-ag-fires-interim-us-attorney-rcna260012.

General's appointment under Section 546(a), at which point the Attorney General purported to designate Ms. Chattah as the First Assistant and declare her the acting U.S. Attorney under the FVRA. *United States v. Garcia*, No. 25-cr-230, 2025 WL 2784640, at *1 (D. Nev. Sept. 30, 2025). The district court disagreed, observing that the FVRA "is a carefully crafted assertion of Congress's power under" the Appointments Clause and "would be defeated if the Executive Branch—the very branch Congress was trying to constrain—could choose whomever it wanted, whenever it wanted, and fill the vacancy simply by declaring that person to be first assistant." *Id.* at *9. It also concluded that the Executive Branch could not "rely on §§ 509, 510, and 515 to temporarily fill the vacant U.S. Attorney position in Nevada." *Id.* at *12.

Courts adjudicating challenges to similar tactics in Los Angeles and New Mexico have reached similar conclusions. *See United States v. Ramirez*, 807 F.Supp.3d 1086, 1105 (C.D. Cal. 2025) (concluding that Bilal Essayli's service as acting U.S. Attorney for the Central District of California "is unlawful and has been unlawful since it began," and that his service "cannot be premised on his appointment as a Special Attorney"); *United States v. Ramirez-Martinez*, No.22-cr-1721, 2026 WL 113431, at *20 (D.N.M. Jan. 14, 2026) (concluding that Ryan Ellison "is not, and was never, a valid Acting

26

United States Attorney for the District of New Mexico under" the FVRA, and "has not been, and cannot be, delegated all of the functions and duties of a United States Attorney").

### B. Unilateral Executive Branch Control Over U.S. Attorney Appointments Enables Prosecutorial Abuses.

The government has defended the Executive Branch's unilateral assertion of U.S. Attorney appointment power on the ground that the President's control over the Executive Branch encompasses the prerogative to select the top prosecutor in each federal district, unimpeded by the involvement of the other branches. *See, e.g.*, Br. for the United States, *United v. James*, No. 25-4673, at 26-27 (4th Cir.) (filed Feb. 9, 2026). That argument is deeply flawed and overlooks the abuses that unilateral filling of U.S. Attorney vacancies has facilitated.

There is no dispute that the "Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974); *see Morrison*, 487 U.S. at 706 (Scalia, J., dissenting) ("Governmental investigation and prosecution of crimes is a quintessentially executive function."). The Supreme Court has identified the authority to investigate and prosecute as one of the President's "conclusive and preclusive" powers. *Trump v. United States*, 603 U.S. 593, 620 (2024).

27

But it does not follow that the Executive Branch possesses the unilateral authority to appoint the U.S. Attorneys to wield those powers. Quite the opposite. Unlike the power to investigate and prosecute, "the power to appoint inferior officers such as [U.S. Attorneys] is not in itself an 'executive' function in the constitutional sense." *Morrison*, 487 U.S. at 695. Although Congress has conferred on the President the power to appoint U.S. Attorneys in the first instance, it has also required Senate advice and consent. 28 U.S.C. § 541(a). The Senate's role in the appointment process aims to "curb Executive abuses of the appointment power." *Edmond*, 520 U.S. at 659 (citing Joseph Story, *Commentaries on the Constitution of the United States* 376-77 (1833)).

The cases throughout the country noted above and the case now on appeal before this Court exemplify Executive Branch abuses of the U.S. Attorney appointment power, resulting in further abuses of prosecutorial authority. For example, shortly after taking over as the interim U.S. Attorney in the District of New Jersey, Alina Habba stated publicly that she intended to use her role as the top federal prosecutor in the state to "turn New Jersey red."[9] At least one judge in the District of New Jersey raised specific

---

[9] Human Events Daily with Jack Posobiec, Newly Appointed New Jersey DA Alina Habba—Live From the White House, Human Events (Mar. 27, 2025),

concerns regarding the actions of the U.S. Attorney's Office—in a case brought against the sitting Democratic Mayor of Newark—under Ms. Habba's leadership. *See United States v. Baraka*, Case No. 25-mj-11131, ECF No. 15 (D.N.J.) (May 21, 2025) (prosecution's conduct "suggests a failure to adequately investigate, to carefully gather facts, and to thoughtfully consider the implications of your actions before wielding your immense power").

In the Eastern District of Virginia, the Attorney General (unlawfully) installed Ms. Halligan as the interim U.S. Attorney two days after the President personally directed a social media post to the Attorney General declaring that Mr. Comey and Ms. James were "guilty as hell" and stating: "We can't delay any longer, it's killing our reputation and credibility . . . . JUSTICE MUST BE SERVED, NOW!!!" *James*, 810 F. Supp. 3d at 756. Three days after her appointment, Ms. Halligan appeared before the grand jury, where she personally presented and secured a two-count indictment against Mr. Comey, mere days before the statute of limitations was due to expire.[10] Soon after the indictment, the President posted on social

---

at 8:41-9:00, https://podcasts.apple.com/ca/podcast/newly-appointed-new-jersey-da-alina-habba-livefrom/id1585243541?i=1000701160703.

[10] Jeremy Herb et al., *Inside the Seven Tumultuous Days That Led to the James Comey Indictment*, CNN (updated Sept. 28, 2025), https://www.cnn.com/2025/09/26/politics/james-comey-indictment-trump-prosecution.

media that Mr. Comey was a "Dirty Cop" and "one of the worst human beings this Country has ever been exposed to."[11]  Two weeks after Mr. Comey's indictment, Ms. Halligan personally presented and secured a two-count indictment against Ms. James.  *Id.* at 756-67.  Approximately one week later, two career prosecutors who had reportedly recommended against charging James were terminated.[12]

This case reflects the same disturbing pattern.  As the district court observed, "[t]hree weeks after Mr. Sarcone claimed the title of Acting U.S. Attorney, he used that authority to subpoena a state law-enforcement office that the President had publicly cast as a political adversary."  ECF No. 50, at 21.  In short, the Executive made a "statutory end-run" to claim an appointment power it did not possess and then "leverage that power against a perceived rival of the President."  *Id.* at 23.  Here and elsewhere, the

---

[11] Melissa Quinn, *Trump's Attacks on Comey and Leadership Shifts in Prosecutors' Office Could Undermine Case, Legal Experts Say*, CBS NEWS (updated Oct. 8, 2025), https://www.cbsnews.com/amp/news/trump-attacks-on-comey-and-leadership-shifts-in-virginia-prosecutors-office-could-undermine-case.

[12] Scott MacFarlane, *Trump Admin. Fires 2 Prosecutors Who Opposed Charges Against N.Y. Attorney General Letitia James, Source Says*, CBS NEWS (Oct. 20, 2025), https://www.cbsnews.com/amp/news/trump-admin-fires-2-prosecutors-opposed-letitia-james-charges.

31

Executive's unilaterally appointed temporary U.S. Attorneys have abused their prosecutorial powers.

# CONCLUSION

This Court should affirm the district court's order.

Respectfully submitted,

April 6, 2026

/s/ James I. Pearce
JAMES I. PEARCE
SAMANTHA P. BATEMAN
MARY L. DOHRMANN
WASHINGTON LITIGATION GROUP
1717 K St NW
Suite 1120
Washington, DC 20006
202-521-8750
jpearce@washingtonlitigationgroup.org

*Counsel for National Association of Criminal Defense Lawyers*

JOEL B. RUDIN
VICE CHAIR, AMICUS COMMITTEE
NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS
152 WEST 57TH ST., 8TH FLOOR
NEW YORK, NY 10019

STEPHEN N. PREZIOSI
CHAIR, AMICUS COMMITTEE
N.Y. STATE ASSOCIATION OF CRIMINAL DEFENSE LAWYERS
48 WALL STREET, ELEVENTH FLOOR
NEW YORK, NEW YORK 10005

32

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify the following:

1. This brief complies with Fed. R. App. P. 29(a)(5) because it contains 6,497 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the brief has been prepared in Georgia 14-point font using Microsoft Word 2018.

3. This brief complies with the electronic filing requirements of Local R. 31.1(c) because the text of the electronic brief is identical to the text of the paper copies and because OpenText was run on the file containing the electronic version of this brief and no viruses were detected.

/s/ James I. Pearce
JAMES I. PEARCE
WASHINGTON LITIGATION GROUP
1717 K St NW
Suite 1120
Washington, DC 20006
202-521-8750
jpearce@washingtonlitigationgroup.org

April 6, 2026

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on April 6, 2026. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

/s/ James I. Pearce
JAMES I. PEARCE
WASHINGTON LITIGATION GROUP
1717 K St NW
Suite 1120
Washington, DC 20006
202-521-8750
jpearce@washingtonlitigationgroup.org

April 6, 2025